2005 WY 101

Jason Dean BALLINGER, an Individual,
Appellant (Plaintiff),

v.

Marc C. THOMPSON, Esq.; and
Webster & Thompson, LLC,
Appellees (Defendants).

In the Matter of the Estate of Gladys
Mildred Ballinger, Deceased: Jason
Dean Ballinger, Personal Representative
of the Estate of Gladys Mildred Balling-
er, Appellant (Plaintiff),

v.

Marc C. Thompson, Esq.; and Webster
& Thompson, LLC, Appellees
(Defendants).

Nos. 04–245, 04–246.

Supreme Court of Wyoming.

Aug. 23, 2005.

430

Representing Appellant: Eldon E. Silverman of Preeo Silverman Green & Egle, P.C., Denver, Colorado.

Representing Appellee: Marc C. Thompson of Webster & Thompson, LLC, Cody, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Jason Dean Ballinger appeals the district court's order granting Webster and Thompson, LLC, and Marc C. Thompson's (collectively Thompson) motion to dismiss Ballinger's legal malpractice suit. The district court granted the motion finding Ballinger had failed to comply with the statute of limitations. We affirm.

## ISSUES

[¶ 2] Ballinger presents the following issues for review:

1. Was Ballinger under "a legal disability" pursuant to Wyo. Stat. 1–3–107(a)(iii) so that his action was timely brought?

2. Was any statute of limitations defense barred under the theory of equitable estoppel for purposes of overcoming a motion to dismiss?

3. Did the statute of limitations begin to run only after "discovery" of the claim and was that within the two-year period, to overcome a motion to dismiss?

4. Should the continuous representation rule be applied to the unique facts of this case to toll the statute of limitations?

Thompson responds with just one issue, "Was the district court correct in ruling that appellant's claims are barred by the statute of limitations?"

## FACTS

[¶ 3] Ballinger hired Thompson to represent him individually and as the personal representative and sole beneficiary of the estate of Gladys M. Ballinger. Thompson entered his appearance in the probate case on August 7, 1998. Because Ballinger was incarcerated in the Park County Jail during portions of 1998 and 1999, Thompson took on additional responsibilities for the estate. One of these additional responsibilities was a duty to obtain and maintain insurance for a home in Cody owned by the estate in which Ballinger lived. Unfortunately, the insurance was allowed to lapse, and there was a gap in coverage from June 18, 1999, until July 23, 1999. In explaining the lapse, Thompson claimed he never received a renewal notice. However, insurance company records indicated a renewal notice was sent to Thompson's office address.

[¶ 4] On June 24, 1999, a fight started in the driveway of the Cody home. The fight led to the death of seventeen-year-old Scott Tannehill. Ballinger was at the home at the time of the fight and was charged with accessory to second degree murder. Thompson represented Ballinger in the criminal proceeding stemming from this charge. In December 1999, after changing his plea to *nolo contendere*, Ballinger was sentenced to a term of incarceration of not less than seven years or more than ten years in the Wyo-

ming State Penitentiary. Ballinger remains incarcerated at this time.

[¶ 5] In February of 2000, an attorney representing the estate of Scott Tannehill contacted Thompson indicating his intent to pursue a wrongful death suit. The attorney wrote:

> We are aware of [Ballinger's] ownership of the property where the incident took place. As with any property, it is fair for us to assume that there is a property casualty policy applicable to the property. Those policies provide insurance coverage for incidents of this nature. I would ask you, on behalf of the survivors of Scott Tannehill to please cooperate with us and notify the carrier of our intent to proceed with the claim.

When Thompson contacted the insurance company, it was confirmed there was a period of time when there was no coverage on the property and this gap included the day of the Tannehill incident. A series of letters and explanations then followed; the relevant portions can be summarized as follows:

- On February 15, 2000, Thompson sent Ballinger a copy of a letter addressed to the insurance company regarding the insurance lapse.
- On February 25, 2000, Thompson discussed the insurance lapse with Ballinger on the telephone.
- On April 21, 2000, the wrongful death complaint was filed. It asserted one cause of action, negligence.
- On April 21, 2000, Thompson sent Ballinger a copy of letters between Thompson and the insurance company discussing the insurance lapse.
- Between April and September 2000, Thompson continued to tell the attorney for the Tannehill estate that he was investigating the matter.
- On September 8, 2000, Thompson sent Ballinger a copy of a letter addressed to Tannehill's attorney concerning the insurance lapse. In the letter Thompson revealed there was not an insurance policy in effect at the time of the accident and claimed that "[e]ven if there was a policy in effect, it would not have covered

the alleged acts under the Complaint." He asserted the policy in effect was only a renter's policy, it had specific exclusions for acts involving assault, and Tannehill had alleged Ballinger committed an intentional act of misconduct. However, the estate of Tannehill had asserted only negligence in its complaint. The Tannehill attorney then subpoenaed the insurance records from the insurance company. After reviewing the documents the attorney was troubled by Thompson's lack of completeness in his initial responses to requests for information concerning insurance on the Cody home. The Tannehill attorney contended that review of the documents established Thompson was well aware of the lapse in coverage that occurred from June 18, 1999, until July 23, 1999, because he was directly involved in procuring the policy and procuring the renewal policy.

- On September 18, 2000, Thompson sent Ballinger proposed discovery responses for the wrongful death action which addressed the insurance issues and included the policy.
- On September 20, 2000, Ballinger signed the discovery responses that indicated there was no insurance at the time of Tannehill's death.
- On December 21, 2000, Thompson discussed the insurance lapse with Ballinger on the telephone. Ballinger stated he did not think it was an issue or conflict. However, Ballinger agreed to consult with another attorney to discuss the insurance lapse.
- In January of 2001, Thompson sent Ballinger a letter from Tannehill's attorney dated December 15, 2000, regarding the insurance lapse issue. That letter contained the following statements: "Because of the apparent failure of your office to pay a premium upon notice of a premium due, there was a lapse in insurance coverage for the Ballinger estate during the time frame Mr. Ballinger was involved with the death of Scott Tannehill. I cannot say whether the lapsed policy would have provided coverage for

the claims of Mr. Tannehill.... Because of that conflict, there is no way for [us] on behalf of the Tannehill estate, to fairly resolve the claim with Dean Ballinger, through you as his attorney. I am duty bound to inform my clients of the potential claims that exist and the reason why there is no insurance coverage.... Since it is apparent that Dean Ballinger may have a claim against you or your firm, I trust you understand the nature of our concern and why we must insist that you withdraw."

- On January 29, 2001, Ballinger consulted with an independent attorney regarding the insurance lapse and the wrongful death suit.

[¶ 6] Thompson withdrew as Ballinger's attorney for the wrongful death case on January 5, 2001. Ballinger then hired a different attorney to represent him in the wrongful death suit. Thompson, however, remained the attorney for the estate. Thompson withdrew from that representation for the estate December 12, 2002.

[¶ 7] On March 31, 2003, Ballinger, individually and as personal representative of the estate, filed suit against Thompson. Ballinger claimed that had Thompson not allowed the insurance to lapse, the wrongful death claim would have been paid by insurance, or at least the cost of the defense would have been covered. Thompson filed a motion to dismiss pursuant to W.R.C.P. 12 or in the alternative W.R.C.P. 56 claiming the statute of limitations provided by Wyo. Stat. Ann. § 1–3–107(a) (LexisNexis 2005) had expired. Ballinger responded asserting he was under a "legal disability other than minority," namely, imprisonment, and therefore the statute was extended under § 1–3–107(a)(iii) to one year after the removal of his disability. Ballinger also asserted equitable estoppel applied, the act and damages were not reasonably discoverable until two years prior to filing, and the continuous representation rule should apply to toll the statute.

[¶ 8] The district court granted Thompson's motion to dismiss. The court rejected Ballinger's position that he was under a legal disability because he was incarcerated, "since it would be bad public policy to give protec-

tion and grant a benefit to someone convicted of a serious crime." The district court also found equitable estoppel and the continuous representation rule did not extend the statute in these circumstances. Ballinger timely appealed.

## STANDARD OF REVIEW

[¶ 9] When reviewing W.R.C.P. 12(b)(6) motions to dismiss, we accept the facts stated in the complaint as true and view them in the light most favorable to the plaintiff. *Duncan v. Afton, Inc.,* 991 P.2d 739, 741–42 (Wyo.1999). We will sustain such a dismissal when it is certain from the face of the complaint that the plaintiff cannot assert any fact which would entitle him to relief. *Id.; see also Robinson v. Pacificorp,* 10 P.3d 1133, 1135–36 (Wyo.2000). However, a Rule 12(b)(6) motion to dismiss is converted to a W.R.C.P. 56 motion for summary judgment if materials outside the pleadings are considered. *Stalkup v. State Dept. of Envtl. Quality,* 838 P.2d 705, 709 (Wyo.1992). In this instance it is clear the district court considered materials outside the pleadings. Thus, we apply the standard of review for summary judgment. Under this standard we examine the record from the vantage point most favorable to the party opposing the motion and give that party the benefit of all the favorable inferences which may be fairly drawn. *Castleberry v. Phelan,* 2004 WY 151, ¶ 8, 101 P.3d 460, 462 (Wyo.2004). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

## DISCUSSION

*Legal Disability*

[¶ 10] Ballinger argues that the statute of limitations applicable to professional services contains a provision extending the statute for a plaintiff "suffering from a legal disability other than minority." Plaintiffs falling into this category have one year from the removal of the disability to bring an action. Wyo. Stat. Ann. § 1–3–107(a)(iii)

(LexisNexis 2005).[1] Ballinger claims that imprisonment is a "legal disability other than minority," and he therefore has one year from when he is no longer incarcerated to bring his action.

[¶ 11] In making his argument, Ballinger asserts that at common law imprisonment was established as a legal disability because felons serving sentences of imprisonment were deemed *"civiliter mortus"* or "civilly dead." Ballinger claims "civil death" meant a prisoner could not sue or be sued and as a result a prisoner had a legal disability. He likewise maintains that because imprisonment created a legal disability many states recognized the statute of limitations was tolled while the person was imprisoned. Ballinger argues that we should recognize Wyoming's statute does the same. He additionally contends courts have a duty to carry out the legislative enactments, and the district court failed to do so when it simply found that "it would be bad public policy to give protection and grant a benefit to someone convicted of a serious crime."

[¶ 12] We agree with Ballinger that the district court's reasoning for granting the motion to dismiss was not based on statutory analysis. The district court based its ruling on policy reasoning which is not the proper standard for statutory interpretation questions. Instead, when considering the meaning of a statute, courts are obligated to try to determine the legislature's intent from the words of the statute. *McNeel v. McNeel,* 2005 WY 36, ¶ 11, 109 P.3d 510, 513 (Wyo. 2005) (citing *In Re Walsh,* 2004 WY 96, ¶¶ 3–4, 96 P.3d 1, 2 (Wyo.2004)). Nevertheless, we determine it was correct to grant the motion to dismiss. Specifically, after our statutory analysis we do not agree with Ballinger that the phrase "legal disability other than minority" includes imprisonment.

[¶ 13] As with all statutory analysis we must start with the plain language of the statute to determine its meaning. *McNeel,* ¶ 11, 109 P.3d at 513. The question in this instance is what does the phrase "legal disability other than minority" mean as it is used in this statute? The statute itself does not define the phrase. However, the plain language indicates that at the time the statute was enacted there were legal disabilities other than minority known in the law. *See Berkin v. Marsh,* 18 Mont. 152, 44 P. 528, 530 (1896). Therefore, we must look to the law as it existed at the time this section was enacted to determine if imprisonment was recognized as a legal disability.

[¶ 14] We begin with Ballinger's assertion that at common law a convicted felon was considered civilly dead. The Supreme Court of Tennessee explains that nearly every jurisdiction subjects a convicted felon not only to criminal punishment but also to other restrictions on civil and proprietary rights. *Cole v. Campbell,* 968 S.W.2d 274, 275–76 (Tenn.1998) (citing Walter Matthews Grant, et al., Special Project, *The Collateral Consequences of a Criminal Conviction,* 23 Vand. L.Rev. 929 (1970) (hereinafter Special Project)). These restrictions, known as civil disabilities, date back to ancient Greece and Rome. *Cole,* at 276. In those societies, a criminal conviction rendered one "infamous" and resulted in the loss of the right to vote, hold office, make speeches, and assemble. *Id.* Similar civil disabilities were also imposed in early English common law in the form of "attainder." *Id.* A person convicted of trea-

---

1. Wyo. Stat. Ann § 1–3–107(a) (LexisNexis 2005) provides in pertinent part:

    (a) A cause of action arising from an act, error or omission in the rendering of licensed or certified professional or health care services shall be brought within the greater of the following times:

    (i) Within two (2) years of the date of the alleged act, error or omission, except that a cause of action may be instituted not more than two (2) years after discovery of the alleged act, error or omission, if the claimant can establish that the alleged act, error or omission was:

    (A) Not reasonably discoverable within a two (2) year period; or

    (B) The claimant failed to discover the alleged act, error or omission within the two (2) year period despite the exercise of due diligence.

    (ii) . . . .

    (iii) For injury to the rights of a plaintiff suffering from a legal disability other than minority, within one (1) year of the removal of the disability[.]

son or a felony, *i.e.*, attained, was subject not only to criminal punishment but also the loss of property, voting, and other civil rights including the right to sue. *Id.; Mosgrave v. McManus*, 24 N.M. 227, 173 P. 196, 198 (1918).

[¶ 15] Some civil disabilities continued to the criminal justice system in the United States. In their role in the United States criminal justice system, civil disabilities fall into one of two categories: civil death statutes and specific disability statutes. *Cole*, 968 S.W.2d at 276. "Civil death statutes are 'blanket provisions that deprive the criminal of [all] rights while he is serving a prison sentence for life or less than life.'" *Id.* (quoting Special Project, at 950) (alteration in original). Specific disability statutes, on the other hand, designate a particular civil disability that occurs upon conviction and remains in effect throughout the defendant's life unless restored by a specific statutory procedure. *Cole*, at 276 (citing Special Project, at 951). A civil disability pursuant to a specific disability statute may include the loss of the right to vote, hold office, serve as a juror, possess firearms, and the denial of professional or occupational licensing. *Cole*, at 276. (citing Special Project, at 952).

[¶ 16] Several states enacted civil death statutes. *See* Special Project, at 950. These same states often provided provisions tolling statutes of limitations for prisoners in order to ensure that a citizen who lacks the capacity to sue while imprisoned will not lose his cause of action. *Id.* at 1025. These tolling statutes were designed to protect persons who are unable to sue because their imprisonment denied them that right. *Id.* at 1026.

[¶ 17] However, "in the absence of statute, the concept of civil death has generally been denied in this country." *Whitson v. Baker*, 463 So.2d 146, 148 (Ala.1985). "Civil death statutes had become too great a burden and there developed a trend away from their strict results. The states then [began] to enumerate the disqualifications that attach

to a conviction of a felony." Alan K. Simpson, *Indirect Legal Consequences of a Conviction for a Felony*, 13 Wyo. L.J. 62, 63 (1958). Wyoming was one such state. Indeed, "Wyoming statutory development rejected the idea of complete civil death and settled upon the loss of three distinct legal privileges under [Wyo. Comp. Stat.] Section 9–104 [ (1945) ]: inability to be an 'elector,' 'juror,' 'or hold any office of honor, trust, or profit within this state.'" *Id.* at 64. Therefore, we must reject Ballinger's claim that a convicted felon was civilly dead in Wyoming.

[¶ 18] Wyoming's major specific disability statute still contains the three distinct privileges noted by Simpson. As it reads today, it provides: [2]

(a) A person convicted of a felony is incompetent to be an elector or juror or to hold any office of honor, trust, or profit within this state, unless:

(i) His conviction is reversed or annulled;

(ii) He receives a pardon;

(iii) His rights are restored pursuant to W.S. 7–13–105(a); or

(iv) His rights as an elector are restored pursuant to W.S. 7–13–105(b) and (c), in which case the person shall remain incompetent to be a juror or to hold any office of honor, trust or profit within the state.

Wyo. Stat. Ann. § 6–10–106 (LexisNexis 2005). When tracing this statute back to its enactment, we find that the right to sue or be sued has never been included. *See* 1890 Wyo. Sess. Laws ch. 73, § 4; Wyo. Comp. Stat. § 9–104 (1945). Thus, it is clear that in 1976 when § 1–3–107 was enacted, convicted felons were not denied the right to sue by statute. Additionally, the argument that a convict had no standing as a party plaintiff has been generally rejected by American courts as a rule of our common law, unless it was provided by statute. *Mosgrave*, 173 P. at 197.

---

**2.** Another civil disability today appears to be the right to possess a firearm. *See Dobson v. Stahla*, 2003 WY 6N, ¶ 7, 63 P.3d 209, 211 (Wyo.2003) (discussing federal regulation), and Wyo. Stat. Ann. § 6–8–102 (LexisNexis 2005), which provides: "Any person who has previously pleaded

guilty to or been convicted of committing or attempting to commit a violent felony or a felony under W.S. 6–5–204(b), and has not been pardoned and who uses or knowingly possesses any firearm is guilty of a felony. . . ."

[¶ 19] Logically then we must also reject Ballinger's contention that imprisonment is a legal disability as contemplated by this statute. "Legal disability" is defined as a "want of legal capacity to do a thing." *Id.* at 198. "As applied to the statute of limitations in civil actions, it would unquestionably mean legal capacity to bring the action...." *Id.* As noted above, in Wyoming a convicted felon is not prohibited from instituting a civil action. Instead, the only civil rights denied upon conviction are those set forth by statute. *See id.* at 198. Undoubtedly Ballinger is correct that imprisonment increases the burdens of bringing a cause of action and presents a unique set of complications for case management. Nevertheless, the right to sue in fact still exists, and we therefore cannot find that it is a legal disability as contemplated by § 1–3–107.

[¶ 20] Ballinger urges us to consider cases from other jurisdictions, particularly Georgia and Wisconsin, which find imprisonment tolls the statute of limitations. *See Maddox v. Hall County,* 162 Ga.App. 371, 291 S.E.2d 442 (1982); *Ghashiyah v. Prudential Ins. Co. of America,* 198 Wis.2d 699, 543 N.W.2d 538 (App.1995). The reasoning of these cases is not particularly helpful because the applicable statutes in those cases specifically identified imprisonment as a condition that tolls the statute of limitations. Ballinger presents no case in which a court has recognized imprisonment as tolling the statute of limitations where imprisonment is not specifically provided by statute as a toll condition, nor did we discover such a case. Instead, it appears the general rule is that imprisonment does not suspend the running of a statute of limitations unless expressly provided. *Mosgrave,* 173 P. at 197. *See also Morgan v. People,* 16 Ill.2d 374, 158 N.E.2d 24, 26 (1959) ("It is the prevailing view in this country that imprisonment does not suspend the running of a statute of limitations unless the statute expressly provides."); Special Project, at 1027 ("If the legislature provides

that the statutes of limitations are tolled for persons 'under any legal disability,' prisoners are not included."). Wyoming's statute does not expressly provide for imprisonment as a disability.[3] Consequently, we find the reasoning of jurisdictions that do unpersuasive.

[¶ 21] We therefore conclude that the phrase "legal disability other than minority" as used in this statute does not include imprisonment. Accordingly, this provision is not applicable to toll the statute of limitations in this instance. Ballinger therefore had two years from the discovery of his injury to bring his action. As discussed later in this opinion, he did not do so.

*Equitable Estoppel*

[¶ 22] Ballinger next asserts that equitable estoppel applies in this instance. He argues he meets the elements of an equitable estoppel claim, and therefore Thompson is barred from asserting the statute of limitations. The elements of an equitable estoppel claim are 1) a delay in filing an action that is induced by the defendant; 2) the defendant misled the plaintiff; and 3) the plaintiff must have acted on the misinformation in good faith to the extent that he failed to pursue his action in a timely manner. *Archuleta v. City of Rawlins,* 942 P.2d 404, 406 (Wyo.1997).

[¶ 23] In this instance we conclude equitable estoppel cannot apply to save the action. While it appears there are factual disputes about whether Thompson misled Ballinger when he claimed several times that the policy would not have covered the wrongful death claim, it is clear there are no facts that could show Ballinger acted on the misinformation in good faith to the extent he failed to pursue his action in a timely manner. Specifically, even accepting Thompson's statements were misleading, Ballinger had received the letter from Tannehill's attorney discussing a cause of action, and he admits he had all the essential

---

**3.** We did turn up one instance in Wyoming statutes where additional time was provided for a prisoner to comply with a time limitation. This was in Wyo. Comp. Stat. § 89–4816 (1931), which provided the time in which one had to file an appeal. However, this statute was superseded when the rules of civil procedure were enacted. *See* W.R.C.P. 73 (1957). Although not necessarily helpful in this instance, this statute does indicate that the legislature knew how to provide for imprisonment to toll a time limit should it desire to do so.

facts for his cause of action by January of 2001. Accordingly, he could no longer in good faith be relying on Thompson's misleading statements as reason not to timely file his action. Thus, we can only conclude there is no material question of fact, and Thompson is entitled to judgment as a matter of law on the matter of equitable estoppel.

*Discovery of the Claim*

[¶ 24] Ballinger next argues that he could not have reasonably discovered his claim until two years prior to his filing. Wyoming is a discovery state which means the statute of limitations begins to run when the plaintiff knows or has reason to know of the existence of a cause of action. *Cabot Oil & Gas Corp. v. Followill,* 2004 WY 80, ¶ 14, 93 P.3d 238, 243 (Wyo.2004); *Murphy v. Housel & Housel,* 955 P.2d 880, 883 (Wyo. 1998). Ordinarily, the issue of when the statute of limitations commences to run would be inappropriate for summary judgment. *Murphy,* at 883. However, if uncontroverted facts exist that demonstrate with specificity the time when a reasonable person would have been placed on notice, we will resolve the question as a matter of law. *Id.*

[¶ 25] In this instance, Ballinger was alerted to the existence of a cause of action as early as February of 2000 when he was first notified of the insurance lapse. As can be seen from the lengthy list in the fact section of this opinion, Ballinger was notified of the lapse on numerous occasions. The lapse was specifically addressed in many different ways over the relevant period of time, including discovery responses, telephone calls, and correspondence. Even with Thompson's assurances that the insurance policy would not have covered the claim, it is clear Ballinger knew or should have known he had a cause of action by at least January of 2001 when he received the letter from Tannehill's attorney insisting Thompson withdraw because of such a cause of action, and he consulted with an independent attorney regarding the insurance lapse. Furthermore, as noted above, Ballinger admits he had the relevant information in January of 2001.

[¶ 26] Therefore, we conclude Ballinger knew or should have known he suffered an injury and the cause of that injury by at least January of 2001. At that point, Ballinger had clearly "discovered" his claim. As a result, we conclude there was no genuine question of material fact regarding this argument, and Thompson is entitled to judgment as a matter of law on this issue as well.

*Continuous Representation*

[¶ 27] Ballinger lastly asserts the continuous representation doctrine should operate in this instance to toll the statute of limitations. The continuous representation doctrine is analogous to the continuous treatment doctrine we have applied in medical malpractice cases. However, we have consistently stated, "[t]he continuing representation doctrine is absent from our legal malpractice statute, and we decline to judicially adopt such a provision." *Connell v. Barrett,* 949 P.2d 871, 874 (Wyo.1997) (quoting *Hiltz v. Robert W. Horn, P.C.,* 910 P.2d 566, 571 (Wyo.1996)). Nevertheless, Ballinger argues Wyoming has recognized the continuous treatment rule in the context of medical malpractice even though there is no statutory enactment of that rule, and we therefore should do the same for legal malpractice. *See Metzger v. Kalke,* 709 P.2d 414 (Wyo. 1985). Although Ballinger's argument has some merit, we decline to adopt the continuous representation doctrine in these circumstances.

[¶ 28] Our reluctance to adopt the doctrine in this case makes sense in light of the reasoning behind the continuous treatment doctrine. As we explained in *Metzger,* the rationale for the continuous treatment rule is:

" * * * [I]n the treatment of a patient the diagnosis might change from time to time, and it is commonly accepted in the medical profession that the diagnosis, in the first instance, is not binding on the physician. He should have the right, during the course of treatment, to change the diagnosis. * * *

" * * * The diagnosis referred to was a continuing biweekly one, and each time an incorrect diagnosis was made and an incor-

rect treatment applied, plaintiff's injuries were extended. It was not the error in the diagnosis originally made by defendant but its adherence thereto and course of treatment that brought about the injuries."

*Metzger,* 709 P.2d at 417 (quoting *Williams v. Elias,* 140 Neb. 656, 1 N.W.2d 121, 124 (1941)). We further explained in *Echols v. Keeler,* 735 P.2d 730, 731–32 (Wyo.1987) (quoting 1 D. Louisell and H. Williams, Medical Malpractice, ¶ 13.08 (1986)):

> "The so-called 'continuous treatment' rule has been defended on the grounds of fairness as well as on the basis of logic. Certainly it would not be equitable to bar a plaintiff who, for example, has been subjected to a series of radiation treatments in which the radiologist negligently and repeatedly administered an overdosage, simply because the plaintiff is unable to identify the one treatment that produced his injury. Indeed, in such a situation no single treatment did cause the harm; rather it was the result of several treatments, a cumulative effect. From the point of view of the physician, it would seem reasonable that if he has made a mistake, a misdiagnosis, for example, he is entitled to the opportunity to correct the error before harm ensues. And, as one court has put it, 'It would be absurd to require a wronged patient to interrupt corrective efforts by serving a summons on the physician.'"

[¶ 29] When considering the "single act exception" to the continuous treatment doctrine in *Jauregui v. Memorial Hospital of Sweetwater County,* 2005 WY 59, 111 P.3d 914, (Wyo.2005), we further explained that where there is a single act of allegedly negligent conduct, the statute of limitations begins to run at the time the plaintiff sustains injury from the act instead of at the end of the course of treatment. *Id.* at ¶ 12, 111 P.3d at 918 (citing *Doyle v. Kuch,* 611 N.W.2d 28, 31 (Minn.App.2000)). Specifically, "when the alleged tort consists of (1) a single act; (2) which is complete at a precise time; (3) which no continued course of treatment can either cure or relieve; and (4) where the plaintiff is actually aware of the facts upon which the claim is based; that is, the plaintiff is aware of the malpractice prior

to the end of treatment" the cause of action begins to run at the time of the negligent act. *Jauregui,* at ¶ 12, 111 P.3d at 918 (citing *Doyle,* at 31).

[¶ 30] In this instance, although Thompson continued to represent Ballinger for some time after the negligent act, *i.e.,* the insurance lapse, it appears that a continuous course of malpractice as contemplated by *Metzger* is not present. Specifically, even accepting that Ballinger relied on Thompson's representations that the policy would not cover the incident and that such representations were incorrect, by January of 2001 Thompson had terminated his representation of Ballinger. Likewise, there is no cumulative effect from repeated negligence such that Ballinger is unable to identify the act that produced his injury past January of 2001. Additionally, there was nothing that Thompson could do to correct the error before harm ensued. Instead, these circumstances present something more closely resembling a single negligent act as described in *Jauregui.* The lapse of the insurance was a single act that was complete at a precise time, which could not be cured, and of which Ballinger was aware prior to the end of Thompson's representation.

[¶ 31] We have also explained "[t]he continuous representation doctrine applies only to malpractice actions where there is a 'clear indicia of an ongoing, continuous, developing and dependent relationship between the client and attorney....'" *Hiltz,* 910 P.2d at 571. "Furthermore, the application of this doctrine should only be applied where the 'professional's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship.'" *Id.* In this instance, Ballinger consulted numerous other attorneys concerning the insurance lapse which indicates his relationship with Thompson was not ongoing, continuous, developing and dependant. Likewise, Thompson's representation appears to merely be a continuing general professional relationship.

[¶ 32] We therefore conclude that the continuous representation doctrine does not apply in this instance to toll the statute of

limitations. Because it does not apply, Ballinger's claim began to run when he "discovered" his cause of action. As we discussed above, the latest the discovery occurred was January of 2001. Thus, when Ballinger filed his cause of action in March of 2003, his action was not timely.

## CONCLUSION

[¶ 33]   For the reasons stated above, we affirm.