2007 WY 42

**Philip and Freddie WILSON,**
**Appellants (Plaintiffs),**

v.

**BOARD OF COUNTY COMMISSIONERS OF The COUNTY OF TETON, a political Subdivision of the State of Wyoming,**
Appellee (Defendant).

No. 05–213.

Supreme Court of Wyoming.

March 14, 2007.

Representing Appellants: Karen Budd–Falen and Brandon L. Jensen of Budd–Falen Law Offices, LLC, Cheyenne, WY. Argument by Mr. Jensen.

Representing Appellee: James L. Radda, Deputy Teton County Attorney, Jackson, WY.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

HILL, Justice.

[¶1]   On May 7, 2004, Appellants, Phillip and Freddie Wilson (Wilsons), filed a declaratory judgment action seeking a declaration from the district court: (1) That Division 4300 of the Teton County Comprehensive Plan and Land Development Regulations (LDR or LDRs) (entitled "Open Space Standards"), which requires a developer to set

* Chief Justice at time of oral argument.

aside open space within any proposed residential subdivision development is facially unconstitutional (as a taking without compensation) and, hence, unenforceable; (2) that Section 4330.D.3., which requires the developer to convey an easement for any open space within the residential subdivision development to a qualified organization (giving that organization authority to enforce the open space restriction), is unconstitutional on its face; (3) that Section 4330.D.3. of the LDRs (if not unconstitutional) is *ultra vires* and beyond the powers conferred upon Teton County by law; and (4) that Section 49440 of the Teton County LDRs (entitled "Calculation of Affordable Housing Standards for Residential Development") is facially unconstitutional (as a taking without compensation) and, hence, unenforceable.   In addition, the Wilsons sought a court order enjoining Teton County from further enforcing the provisions of the disputed LDRs.

[¶2]   By order entered on March 21, 2005, the district court granted Appellee's, Board of County Commissioners of the County of Teton (Teton County), motion to dismiss Counts 1, 2, and 4 pursuant to W.R.C.P. 12(b)(6) (failure to state a claim upon which relief can be granted).   With respect to Count 3, Teton County filed a motion for summary judgment and on July 18, 2005, the district court entered its order granting that motion.   We will affirm the district court's orders on the basis that the Wilsons' claims are untimely, and they do not currently have standing to make a facial challenge to the constitutionality of the Teton County LDRs or to otherwise challenge the orders of the district court.

ISSUES

[¶3]   The Wilsons raise these issues:

A.   Whether the United States Supreme Court's standards with regard to the conditional granting of a development permit, as set forth in *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) and *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), apply

to Teton County's regulations conditioning subdivision approval?

B.  Whether [Wilsons'] takings challenge is ripe for review even though Teton County has not been provided an opportunity to avoid an "unconstitutional application" of the challenged regulations?

C.  Whether Teton County's subdivision regulations fail to substantially relate to a legitimate government interest?

D.  Whether Section 4300.D.3 of Teton County's subdivision regulations provides for an unlawful physical appropriation of property?

E.  Whether Teton County has express or implied authority to require the conveyance of rights to enforce open space restrictions to an organization qualified and dedicated to preserving the values intended by the open space restrictions?

F.  Whether [Wilsons'] claims and allegations are barred by the statute of limitations, the doctrine of equitable estoppel, or laches?

Teton County offers this statement of the issues:

1.  Whether the heightened judicial scrutiny required by *Nollan v. California Coastal Commission* . . . and *Dolan v. City of Tigard* . . . applies to Teton County's open space and affordable housing regulations, which are legislatively adopted, non-discretionary (formula-based or quantitative) land use regulations?

2.  Whether the "rough proportionality" and "individualized determinations" standards of *Dolan* can *ever* be challenged *facially*?

3.  Whether a challenge to the facial constitutionality of a land use regulation is ever tenable where the very terms of the challenged regulation permit those who administer it to avoid an unconstitutional application?

4.  Whether the Wilsons' taking and substantive due process claims are barred by laches?

5.  Whether Teton County's open space and affordable housing regulations comply with substantive due process?

6.  Whether Section 4330.D. results in a physical invasion of property under the Takings Clause?

7.  Whether Wyo. Stat. § 18–5–201 impliedly authorizes Teton County to require the conveyance of rights, in perpetuity, to enforce open space restrictions to an organization qualified and dedicated to preserving the values intended by the restrictions?

8.  Whether the conveyance of such rights in perpetuity unlawfully deprives future boards of county commissioners from acting in the public good?

9.  Whether there is anything about requiring the conveyance of rights, in perpetuity, to enforce open space restrictions pursuant to a development option that contravenes public policy?

10.  Whether the statute of limitations bars the Wilsons' *ultra vires* claims?

11.  Whether equitable estoppel bars the Wilsons' ultra vires claims?

### FACTS AND PROCEEDINGS

[¶ 4]  The Wilsons filed a complaint for declaratory relief on May 7, 2004, seeking to declare portions of the Teton County LDRs "unconstitutional, *ultra vires,* and consequently unenforceable." It is undisputed that the LDRs at issue were adopted by Teton County on May 9, 1994. The Wilsons contended that, on the face of the matter, the LDRs effected an uncompensated taking of private property (denied Wilsons the economically beneficial use of their property or were a physical taking) and, therefore, were facially unconstitutional. The Wilsons also contended that the LDRs did not "substantially advance a legitimate state interest, maintain an 'essential nexus' with a legitimate state interest, or bear some roughly proportional relationship to the burden on the landowner." The Wilsons asked the district court to enjoin Teton County from "further use, implementation, or enforcement" of the LDRs. One of the central complaints voiced by the Wilsons was that, under the LDRs, approval of their Hog Island Subdivision (Subdivision) was contingent upon them setting aside ten acres of mandatory open

space and approximately five acres for affordable housing units.

[¶ 5] The Subdivision consists of approximately forty acres and is located in Teton County about eight miles south of Jackson along U.S. Highway 89. The plat for the Subdivision was approved on October 19, 1999. As approved, the Subdivision was split into a thirty-acre parcel for residential development and ten acres of mandatory open space. The thirty residential acres were divided into eighteen residential lots. Three of the lots were sold as "affordable housing" (value set by Teton County at $40,000, $50,000, and $60,000). Three of the lots were sold as "attainable housing" ($80,000 apiece). Lot eighteen is reserved for current occupation and use by the Wilsons' construction business. The business enjoys grandfathered status at that location. The Wilsons sold four of the remaining lots, and three were gifted to their children. Four of the lots remained unsold at the time the complaint was filed. At the time the instant complaint was filed, the Wilsons purported to be pursuing administrative remedies against Teton County because of the unconstitutional standards that deprived them of the economically beneficial use of their property. If there has been any progress with respect to that matter in the interim, it has not been reported to this Court.

[¶ 6] Under the LDRs, the Wilsons were required to devote 25% (10 acres) of the acreage within their subdivision to open space. The Wilsons' open space (which they continue to own and from which they may bar the public) is designated as a "hay pasture" and "arena area." Of course, it is subject to the limiting easement that requires that it remain a hay pasture or some other approved open space use. It is this limitation on its use that the Wilsons contend amounts to a "taking" as contemplated by the Takings Clause of the United States Constitution. The Wilsons were also required to devote 15% of their subdivision to affordable or attainable housing and they characterize this as a "taking" as well.

[¶ 7] The Teton County LDRs were enacted on May 9, 1994, and constitute a regulatory system which purports to protect the health, safety, and general welfare of the citizens of Teton County. Specific goals were these:

a. To maintain a sense of place and of community, and a way of life based upon Teton County's western heritage;

b. To protect Teton County's natural and scenic resources, including wildlife, as a primary element of community character;

c. To maintain social and economic diversity;

d. To maintain a balance between visitation and community life; and

e. To preserve the character of some existing neighborhoods and commercial centers and to enhance others through redevelopment.

[¶ 8] In addition, the Comprehensive Plan and Land Development Regulations set these objectives:

a. Maintain open space in continuous tracts to allow the continuation of agricultural options and to protect rural character where appropriate;

b. Protect key natural resources and features;

c. Identify and protect critical wildlife habitat and migration corridors;

d. Protect key scenic vistas and scenic areas;

e. Establish the spatial and functional relationships of structures to a site as the basis for regulating development; and

f. Facilitate the protection of important natural, scenic, and agricultural areas through conservation easements to the extent that minimum development may be allowed on sensitive parcels to facilitate protection of large parcels. [5]

[¶ 9] The Wilsons contend that there can be no justifiable need for additional "open space" in Teton County because 97% of it is already designated as National Park, National Forest, National Elk Refuge wilderness areas, and other public lands. Moreover, they contend owners are given no compensation for the property that is required to be devoted to open spaces. In addition, the open space is supervised by an organization "qualified and dedicated" to preserving the

values intended by the restrictions on open spaces. With respect to affordable housing, the Wilsons contend that developers are required to set aside 15% of the lands to be developed as affordable housing without there being any specific demonstration of a need for it arising from their particular development, nor any compensation for it. The LDRs, however, state the factual basis that Teton County relied upon in adopting this portion of the LDRs, i.e., that luxury/vacation-home development creates a need for affordable and attainable housing that can be set at about 15% of luxury/vacation-home development. The Wilsons contend that this formulaic approach deprives them of individualized consideration and that it is not "roughly proportional" to any need that their development might have created.

[¶ 10] No fact-finding was done by the district court, and it is the Wilsons' position that none need be done. That is, they argue that it is evident upon the face of the LDRs that they violate the constitutional principles articulated by the Takings Clause and the Due Process Clause. Teton County filed a motion to dismiss with respect to Counts 1, 2, and 4 of the complaint and answered with respect to Count 3. Nine documents drawn from the LDRs were attached to the motion to dismiss as exhibits. The Wilsons filed a motion to strike the exhibits numbered 3 through 9, as well as a responsive pleading asking that the motion to dismiss be denied. The district court denied the Wilsons' motion to strike exhibits 3 through 9.[1] It is only because these exhibits are in the record that we are able to even consider, as a general matter, the issues raised by the Wilsons in their complaint as well as in this appeal. It would, indeed, be very difficult to consider the LDRs' facial constitutionality if we did not see the "face" of the LDRs in context. Moreover, it is in the consideration of the totality of the LDRs included in the record that we find the basis for resolving this appeal short of giving a substantive answer to

the Wilsons' ultimate question. The district court granted Teton County's motion to dismiss Counts 1, 2, and 4 on March 21, 2005. Teton County filed a motion for summary judgment with respect to Count 3. The district court granted that motion by order entered on July 18, 2005. The Wilsons' notice of appeal was filed on August 17, 2005. The case was argued before the Court on February 15, 2006, and we took the matter under advisement on that date.

## STANDARD OF REVIEW

[¶ 11] We review the district court's orders granting dismissal of portions of the complaint and summary judgment with respect to others, wherein questions of law were decided, de novo. *Black v. William Insulation Co., Inc.,* 2006 WY 106, ¶ 7, 141 P.3d 123, 127 (Wyo.2006).

## THE ANALYTICAL FRAMEWORK

[¶ 12] Below, we set out some of the analytical tools that will apply to the disposition of the issues raised in this case. With respect to a district court's grant of a motion to dismiss under W.R.C.P. 12(b)(6) and the granting of a motion for summary judgment, we have held:

When reviewing W.R.C.P. 12(b)(6) motions to dismiss, we accept the facts stated in the complaint as true and view them in the light most favorable to the plaintiff. *Duncan v. Afton, Inc.,* 991 P.2d 739, 741–42 (Wyo.1999). We will sustain such a dismissal when it is certain from the face of the complaint that the plaintiff cannot assert any fact which would entitle him to relief. *Id.; see also Robinson v. Pacificorp,* 10 P.3d 1133, 1135–36 (Wyo.2000). However, a Rule 12(b)(6) motion to dismiss is converted to a W.R.C.P. 56 motion for summary judgment if materials outside the pleadings are considered. *Stalkup v. State Dept. of Envtl. Quality,* 838 P.2d 705, 709 (Wyo.1992). In this instance it is clear the

---

1. *Exhibit 3* is a copy of Teton County's "Beneficial Use Determination" regulation; *Exhibit 4* is a copy of the "Variance" regulation; *Exhibit 5* is a copy of the "Community Vision" portion of the Teton County Comprehensive Plan; *Exhibit 6* is a copy of the "Community Character" portion of the plan; *Exhibit 7* is a copy of the "Natural and Scenic Resources" portion of the plan; *Exhibit 8* is a copy of the chapter of the plan dealing with "Affordable Housing;" and *Exhibit 9* is the "Residential Affordable Housing Standards" of the LDRs.

district court considered materials outside the pleadings. Thus, we apply the standard of review for summary judgment. Under this standard we examine the record from the vantage point most favorable to the party opposing the motion and give that party the benefit of all the favorable inferences which may be fairly drawn. *Castleberry v. Phelan,* 2004 WY 151, ¶ 8, 101 P.3d 460, 462 (Wyo.2004). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

*Ballinger v. Thompson,* 2005 WY 101, ¶ 9, 118 P.3d 429, 433 (Wyo.2005); also see *Askvig v. Wells Fargo Bank Wyoming, N.A.,* 2005 WY 138, ¶ 11, 121 P.3d 783, 787 (Wyo. 2005); *Wilson v. Town of Alpine,* 2005 WY 57, ¶ 4, 111 P.3d 290, 291 (Wyo.2005); and *Simon v. Teton Board of Realtors,* 4 P.3d 197, 200 (Wyo.2000).

[¶ 13] Because of the disposition upon which we have settled, we will not consider the constitutional challenge propounded by the Wilsons.

## DISPOSITIVE ISSUE

■ [¶ 14] Before we may reach the heart of this controversy, there are several preliminary issues we must address. This, of course, is premised on the principle that we will not address constitutional issues if we are able to resolve the case on other grounds. *State ex rel. Wyoming Department of Revenue v. Union Pacific Railroad Company,* 2003 WY 54, ¶ 43, 67 P.3d 1176, 1190–91 (Wyo.2003) (and cases cited therein); compare *In re RM,* 2004 WY 162, ¶¶ 8, 30–39, 102 P.3d 868, 871, 877–80 (Wyo.2004).

[¶ 15] Of particular importance to these considerations is Section 5190, BENEFICIAL USE DETERMINATION, of the Teton County plan, which provides:

If after the submission and decision on the appropriate application for development permits for a plan for development of land, a landowner in the unincorporated County is of the opinion that an economically beneficial use of that landowner's land has been denied by the application of these Land Development Regulations, then the procedures of this Section shall be used prior to seeking relief from the courts in order that any denial of economically beneficial use of land may be remedied through a nonjudicial forum.

[¶ 16] That section goes on to spell out a detailed and expeditious application and hearing procedure. The "Beneficial use standards" are of particular importance:

C. **Beneficial use standards.** In determining if a landowner has been deprived of an economically beneficial use of land, the Hearing Officer and Board of County Commissioners shall take into account the following factors:

1. **Economically viable use.** In making the determination of whether the land is provided an economically viable use, the Hearing Officer/Board of County Commissioners shall first evaluate the uses of the land as provided by these Land Development Regulations, and the uses of land in relation to the uses provided similarly situated lands. For the purposes of this Section, economically viable use means the opportunity to make a return equivalent to that which would have been received from a conservative financial investment. Transitory economic issues shall not be relevant to this determination.

2. **Diminution in value.** The market value of the land, as established by the comparable sales approach, prior to adoption of these Land Development Regulations which caused the landowner to apply for relief shall be compared to the market value of the land, as established by the comparable sales approach, with the regulations as applied. Market value of the land prior to the adoption of the Land Development Regulations shall constitute its highest and best use on March 11, 1991 or the date of purchase of the land, whichever is later, and any other land value/appraisal information that the applicant would like to be considered. All appraisals shall be proposed by qualified licensed appraisers, and shall follow the best professional practices as established by the profession. A mere diminution in market value is not sufficient to support a deter-

mination of denial of economically beneficial use; the diminution must be so substantial that it effectively deprives the landowner of any material use or enjoyment of the land, commensurate with any reasonable investment backed expectations, if any.

3. **External costs**

a. **Subsidy.** The amount or nature of any subsidy that may be required by Teton County, neighbors, purchasers, tenants, or the public at large if the uses allowed under these Land Development Regulations are modified.

b. **Other adverse effects.** Any other adverse effects on the County or its residents.

4. **Current state of the law.** The state of the law established by the United States Supreme Court, the 10th Circuit Federal Court of Appeals, and the Wyoming Supreme Court relevant to these standards.

If, after a hearing, it is determined that the landowner has been deprived of the economically beneficial use of land, then the landowner is entitled to relief.

[¶ 17] Teton County also points out that Section 5160, Variances, provides that landowners may be entitled to relief from the LDRs when, "... owing to special circumstances or conditions, the literal enforcement of the provisions of these Land Development Regulations would result in undue and unnecessary hardship...."

[¶ 18] Finally, Teton County contends that a constitutional question might have been avoided had the Wilsons applied for treatment under Section 49450.C., **Payment of in-lieu fee.**

[¶ 19] The gist of Teton County's argument is that, because the Wilsons failed to take advantage of these administrative remedies, this Court should decline to consider the constitutional challenges. That is, if a beneficial use determination were made, a variance granted, and/or an appropriate in-lieu fee paid, then the LDRs would not be unconstitutional, and that is one of the purposes of those sections of the LDRs.

## DISCUSSION

[¶ 20] The Wilsons presented their Hog Island Subdivision plan to the County, including a specific election of options under the LDRs which allowed for greater dwelling unit density (i.e. more lots on the land), in exchange for setting aside a greater amount of open space than was otherwise required. In addition, the LDRs required some provision for affordable housing. The Wilsons' final subdivision plan approved by the County in October of 1999, included ten acres of open space and reservation of some lots for affordable housing.

[¶ 21] The Wilsons did not appeal the conditions imposed on their Subdivision or otherwise contest the validity of the open space or affordable housing regulations at that time. Instead, they took advantage of the benefits of the regulations by developing the Subdivision with greater dwelling unit density and conveying most of the lots. The language of the open space easement specifically describes the Wilsons' motivations at the time they sought approval of their plat that included open space and affordable housing conditions. The easement, which identifies the Wilsons as grantor and the Teton County Scenic Preserve Trust as grantee, states in pertinent part:

WHEREAS, the Teton County Land Development Regulations permit an increase in development potential in exchange for preservation of open space; and

WHEREAS, the Grantor desires to preserve and protect the natural scenic and agricultural values of the property and to take advantage of an increase in development potential in exchange for doing so; and

WHEREAS, the Grantor is willing to preserve ten (10) acres of property of open space in consideration for the ability to develop an eighteen (18) lot residential subdivision on the property.

NOW, THEREFORE, in consideration of the increase in development potential to which the Grantor shall be entitled by Teton County's Land Development Regulations ... Grantor grants and conveys Grantee an Open Space Easement.

[¶ 22] Over a year after the Subdivision had been approved, the Wilsons commenced an administrative proceeding pursuant to the LDRs contesting the County's conditions on their Subdivision. According to the Wilsons, that administrative proceeding is still pending. On May 7, 2004, approximately four and a half years after the Subdivision was approved, the Wilsons filed the declaratory judgment action at issue here. When they filed this action, all but four of the lots in the Subdivision had been sold, gifted, or reserved for their business. In their complaint, the Wilsons argued the land use regulations requiring open space and affordable housing were facially unconstitutional and they had suffered an unconstitutional taking when the County conditioned the approval of their Subdivision upon their compliance with those requirements. The County objected to the Wilsons' declaratory judgment action because it was filed so long after approval of the Subdivision and challenged it on the bases of estoppel, laches, and/or waiver. We conclude that these defenses, whether considered singly, or in combination, provide an appropriate basis for affirming the district court's orders.

[¶ 23] In *Pfeiffer v. City of La Mesa,* 69 Cal.App.3d 74, 137 Cal.Rptr. 804 (1977), the city conditioned the landowners' building permit by requiring them to grant an easement to the city and construct a storm drain on their property. Although the landowners disagreed with the condition, they did not undertake any legal action to have it removed or declared invalid at that time, but, instead, complied with it "under protest" and went forth with their project. Later, the landowners commenced an inverse condemnation action against the city. The trial court granted the city a judgment on the pleadings, and the landowners appealed. The California court of appeals addressed the issue of "whether a landowner can comply with a condition 'under protest,' construct the required improvement, and then maintain an action in inverse condemnation to recover his costs." The court held the landowners should have availed themselves of the procedures to challenge the conditions before complying with them and was unconvinced by their argument that they were compelled to accept the conditions by their economic needs to continue with the construction. The court said: "If every owner who disagrees with the conditions of a permit could unilaterally decide to comply with them under protest, do the work, and file an action in inverse condemnation on the theory of economic coercion, complete chaos would result in the administration of this important aspect of municipal affairs." *Id.* at 806. "It is fundamental that a landowner who accepts a building permit and complies with its conditions waives the right to assert the invalidity of the conditions and sue the issuing authority for the costs of complying with them." *Id.* at 805; *see also, County of Imperial v. McDougal,* 19 Cal.3d 505, 138 Cal.Rptr. 472, 564 P.2d 14, 18 (1977); *Schott v. City of Kingman,* 461 F.2d 593 (9th Cir.1972).

[¶ 24] More recently, a California court of appeals rejected a landowner's belated takings challenge in *Serra Canyon Co., Ltd. v. California Coastal Comm'n,* 120 Cal.App.4th 663, 16 Cal.Rptr.3d 110 (Cal.App.2004). In 1981, the California Coastal Commission granted a landowner a permit to expand his mobile home park on the condition the landowner record an irrevocable offer to dedicate certain property to the Commission. The landowner subsequently conveyed the property encumbered by the offer to dedicate to Serra, and in 2002, the Commission's assignee adopted a resolution to accept the offer. Serra filed a suit seeking an injunction preventing acceptance of the offer to dedicate and a declaration it would suffer an unconstitutional taking (inverse condemnation) if the offer were accepted. *Id.* at 667–69, 16 Cal. Rptr.3d 110. The court ruled Serra's inverse condemnation claim arrived "20 years too late." Because Serra's predecessor-in-interest had agreed to the condition and accepted the benefit of the permit, Serra was bound by the condition and its predecessor's waiver of the right to contest it. The court specifically rejected Serra's argument that, by phrasing the issue in constitutional terms, it could avoid the requirement that the condition be challenged in a timely manner. The court stated: "Once the Commission's permit decision becomes final, the affected property owner is estopped from relitigating the valid-

ity of the decision in a subsequent inverse condemnation action." *Id.* at 666–670, 16 Cal. Rptr.3d 110; see also, *L.A. Development v. City of Sherwood,* 159 Or.App. 125, 977 P.2d 392 (1999).

[¶ 25] Like the Wilsons, the landowner in *Serra* claimed it had suffered an unconstitutional taking under the "exaction" theory as recognized by the United States Supreme Court in *Nollan v. California Coastal Comm'n.,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); and *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). The California court specifically distinguished the procedural histories of *Nollan* and the *Serra* case, as follows:

> It bears noting that the proper administrative procedures were followed in the case Serra relies upon, *Nollan v. California Coastal Comm'n.* (1987) 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (*Nollan*). The Commission required the Nollans to provide a public easement on their beachfront lot in Ventura as a condition of allowing them to demolish a tiny bungalow and build a decent-sized house. (*Id.* at pp. 827–828, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677.) The Nollans protested and promptly filed a petition for a writ of mandate seeking to invalidate the condition. During the proceedings in superior court, the Nollans argued that the easement condition violated the Takings Clause of the Fifth Amendment. The inverse condemnation claim was thus preserved for review as the case wound its way to the Supreme Court. (*Id.* at pp. 828–830, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677.)

*Serra,* 120 Cal.App.4th at 670, 16 Cal.Rptr.3d 110.

[¶ 26] In *Trimen Dev. Co. v. King County,* 65 Wash.App. 692, 829 P.2d 226 (1992), a Washington developer obtained county approval for two subdivision developments. In accordance with an ordinance designed to protect open space, the county conditioned approval of the developments upon reservation of open space or payment of a fee in lieu of reserving open space. *Id.* at 227–29. The developer elected to pay the fee and did not appeal the condition at that time. *Id.* However-er, the developer subsequently filed a declaratory judgment action claiming the ordinance was unlawful and it was entitled to reimbursement of the open space fees. *Id.* at 229. The Washington court of appeals upheld the trial court's dismissal of the developer's suit because it had failed to appeal the condition after the county had issued final approval of the developments. *Id.* at 229–31. As a separate rationale for the dismissal, the court ruled the developer was estopped from bringing its late claim for reimbursement of the fees it paid in lieu of providing open space in its development plans. *Id.* at 231–32. The court stated: "We cannot countenance allowing a developer to reap the advantages of final plat approval obtained without challenge to the approval conditions, and only bring a challenge to those conditions after the municipality has lost any ability to negotiate a solution to the problem other than refund of the fee." *Id.* at 231.

[¶ 27] The reasoning employed by these courts is persuasive. There must be a limit on when a landowner can bring a takings action, especially when, as here, the landowners did not object to the conditions at the time of approval and actually took advantage of the benefit of increased density offered by the regulations. Without a restriction on the time for contesting property development conditions, the government would be perpetually exposed to unlimited takings challenges. Thus, we affirm the dismissal of the Wilsons' takings claims without considering the substance of their constitutional challenges because they did not contest the conditions in a timely manner.

[¶ 28] We note that the Wilsons could still maintain a facial challenge to the constitutionality and validity of the LDRs with regard to how they may affect land not involved in the approved subdivision. However, the record here does not include any showing that the Wilsons currently have any other property to which the LDRs might apply. Consequently, they lack the necessary standing to challenge the validity of the LDRs.

[¶ 29] We explained the concept of standing in the context of declaratory

judgment actions in *Pedro/Aspen, Ltd. v. Bd. of County Comm'rs for Natrona County*, 2004 WY 84, 94 P.3d 412 (Wyo.2004). "Standing is a legal concept designed to determine whether a party is sufficiently affected to insure that the court is presented with a justiciable controversy." *Pedro/Aspen*, ¶ 8, 94 P.3d at 415, quoting *Jolley v. State Loan and Inv. Bd.*, 2002 WY 7, ¶ 6, 38 P.3d 1073, 1076 (Wyo.2002) (citations omitted). *See also, Cathcart v. Meyer*, 2004 WY 49, ¶ 11, 88 P.3d 1050, 1057 (Wyo.2004). The standing requirement generally is not relaxed for actions brought under the Uniform Declaratory Judgments Act. We described the standing requirements in declaratory judgment actions in *Pedro/Aspen*, ¶ 9, 94 P.3d at 415–16 as follows:

1. The parties must have existing and genuine, as distinguished from theoretical, rights or interests.

2. The controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion.

3. It must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or, wanting these qualities to be of such great and overriding public moment as to constitute the legal equivalent of all of them.

4. The proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues.

The fundamental inquiry in determining whether a party has standing is whether he has " 'a tangible interest' in the controversy." *Pedro/Aspen*, ¶ 10, 94 P.3d at 416.

[¶ 30] Unquestionably, when the Wilsons applied for approval of their subdivision, they had a tangible interest in the validity of the LDRs. Nevertheless, as we explained earlier, they relinquished their right to contest the conditions imposed on their subdivision under the regulations when they did not challenge them. The Wilsons do not assert in their complaint that they have other land subject to the land use regulations that they wish to subdivide. Thus, they no longer have a "tangible interest" in the validity of the land use regulations. On the basis of the record extant, the Wilsons do not currently have standing to present a facial challenge to the constitutionality of the open space or affordable housing regulations.

## CONCLUSION

[¶ 31] The Wilsons failed to address their concerns about the constitutionality of the LDRs, or the authority of the county commissioners to enforce them, in a timely manner. Therefore, we conclude that the remedies the Wilsons sought in this declaratory judgment action were waived, and they lack standing to pursue their claims in this case. The orders of the district court are affirmed.