Mary SHARSMITH, Appellant
(Plaintiff),

v.

William HILL, M.D., William Fogarty,
M.D., and St. John's Hospital,
Appellees (Defendants).

No. 87–162.

Supreme Court of Wyoming.

Nov. 9, 1988.

Gerald R. Mason (argued), of Mason, Twichell & Graham, Pinedale, and Michael S. Jarboe and Jim Christiansen, Sacramento, Cal., for appellant.

Travis W. Moffat, Lander, and Gary D. Stott (argued), of Richards, Brandt, Miller & Nelson, Salt Lake City, Utah, for appellee Hill.

Robert G. Berger and Jeffrey J. Gonda (argued), of Lonabaugh and Riggs, Sheridan, for appellee Fogarty.

R.R. Bostwick (argued), of Murane & Bostwick, Casper, for appellee St. John's Hosp.

Before THOMAS, CARDINE, URBIGKIT and MACY, JJ., and TAYLOR, District Judge.

CARDINE, Chief Justice.

In this medical malpractice action, the district court granted summary judgment in favor of appellees William Hill, M.D., William Fogarty, M.D. and St. John's Hospital. Appellant Mary Sharsmith contends that the district court erred in granting summary judgment. The issues presented for our review concern the statute of limitations and the existence of genuine issues of material fact.

We reverse.

## FACTS

In October of 1981, Mary Sharsmith contacted Dr. Morris Mellion and Dr. Kenneth L. Lambert for treatment of a lump behind her left knee. An arthrogram was performed, and the lump was diagnosed as a benign Baker's Cyst. No immediate treatment was recommended. By May of 1982 the mass had enlarged and Ms. Sharsmith consulted Dr. John Feagin, an orthopedic surgeon who practices with Dr. Lambert. Dr. Feagin recommended surgical removal of the mass. Ms. Sharsmith was hospitalized in St. John's Hospital on May 19, 1982 for surgical excision of the mass, which was assumed to be a Baker's Cyst. The mass was removed and transported in three parts to St. John's pathology department, where it was examined by pathologists Dr. William Hill and Dr. William Fogarty. The first examination was conducted by Dr. Hill, who was at St. John's Hospital on locum tenens privilege in the temporary absence of Dr. Fogarty. During the surgery, he examined a frozen section of a portion of the mass and reported back to Dr. Feagin that the mass was benign. Dr. Feagin then completed the surgery. Several days later, after returning to Jackson, Dr. Fogarty microscopically examined the permanent sections and issued a written report concluding that the mass was a benign neurilemoma. Ms. Sharsmith was released from the hospital.

On December 6, 1982, Ms. Sharsmith reported to Dr. Feagin that she was experiencing swelling at the operative site. Dr. Feagin performed a physical examination in which he noted some swelling, but he could not make a definitive diagnosis and told Ms. Sharsmith to return in a month. Ms. Sharsmith returned to Dr. Feagin on January 18, 1983. At this point, Dr. Feagin began to doubt the accuracy of the diagnosis contained in the pathological report. He sent a letter to Dr. Fogarty, asking him to review the slides again and obtain consultation if appropriate. Dr. Fogarty apparently examined the slides again, and while his response to Dr. Feagin's inquiry is not revealed in the record, Dr. Fogarty personally assured Ms. Sharsmith that the initial diagnosis was correct and the tumor was benign.

On January 28, 1983, Ms. Sharsmith consulted Dr. Lambert, who advised her that the mass removed by Dr. Feagin was a benign tumor, that further tests were not required and that she should return in a month. When Ms. Sharsmith returned to

Dr. Feagin on February 15, 1983, he was able to distinguish two distinct masses at or near the operative site. Dr. Feagin referred Ms. Sharsmith to the University of Utah Medical Center at Salt Lake City for a second biopsy and pathological diagnosis.

On February 24, 1983, Dr. Sherman Coleman performed surgery on Ms. Sharsmith's left knee and calf and removed two tumors which were diagnosed as malignant. The pathology staff at the University Medical Center in Utah reviewed the slides prepared by Dr. Fogarty in conjunction with his May 1982 diagnosis and concluded that the mass removed in May 1982 was a malignant schwannoma and not a benign neurilemoma. After consulting with Dr. Coleman and several other doctors in Utah, Ms. Sharsmith elected to have her left leg amputated above the knee. The amputation was performed on March 16, 1983.

On February 14, 1985, Ms. Sharsmith filed this malpractice action against appellees and several other doctors. She claims that Dr. Hill was negligent in either failing to perform a microscopic analysis or failing to report or preserve his findings in connection with a microscopic analysis. She claims that Dr. Fogarty was negligent in failing to refer the pathological slides to a soft tissue tumor specialist. She contends that St. John's Hospital is vicariously liable for the pathologists' negligence because both doctors were ostensible or apparent agents of the hospital. Finally, she asserts that the hospital is directly negligent for failing to maintain adequate peer review procedures. After considerable discovery, the district court granted appellees' motions for summary judgment. The order granting summary judgment does not contain a statement of the evidence which is undisputed or the reasons for granting summary judgment.

## STATUTE OF LIMITATIONS

### Continuous Course of Treatment

Wyoming's statute of limitations for medical malpractice actions, as it pertains to this case, begins to run at one of two alternative times: (1) the time of the alleged act, error or omission giving rise to the plaintiff's claim or (2) the time of discovery of the alleged act, error or omission if it was not reasonably discoverable, or not discovered by the claimant despite due diligence, within a two-year period. W.S. 1–3–107(a)(i).

Appellees contend that the alleged acts, errors or omissions by the pathologists occurred when they made their diagnoses in May and/or June of 1982. They assert that because appellant discovered these acts, errors or omissions within two years of their occurrence, the statute of limitations had run by the time appellant filed her lawsuit on February 14, 1985. Appellant does not seek shelter in the statute's discovery provisions; instead she urges that the act, error or omission did not occur, and therefore the statute did not begin to run until the termination of Dr. Feagin's continuous course of treatment, which occurred when he referred appellant to Dr. Coleman on February 15, 1983.

In response to the rather harsh statute of limitations in medical malpractice actions, we held in *Metzger v. Kalke*, Wyo., 709 P.2d 414, 417 (1985), that "the act, error or omission which starts the running of the statute of limitations against medical malpractice actions is the termination of the course of treatment for the same or related illnesses or injuries." We clarified this rule in *Echols v. Keeler*, Wyo., 735 P.2d 730 (1987), where we explained that the relevant course of treatment is that of "the practitioner against whom claim is made." Id. at 731. We held in *Echols* that the continuous treatment of the patient ceased when the treating practitioner referred the patient to another practitioner and no longer assisted in the patient's treatment or associated with the doctors thereafter treating the patient.

Applying the continous treatment concept to the present case, it seems clear that with respect to the treating physician, Dr. Feagin, a continuous course of treatment existed at least until he referred appellant to Dr. Coleman on February 15, 1983. Dr. Feagin, however, is not "the practitioner against whom claim is made." *Echols v. Keeler*, supra at 731. Instead, appellant's

existing claims are against the pathologists and the hospital, whose direct "treatment" of appellant terminated before Dr. Feagin referred her to Dr. Coleman. Appellant contends, nonetheless, that Dr. Feagin's course of treatment should be imputed to the pathologists and the hospital because Dr. Feagin continued to rely upon the misdiagnosis of the pathologists throughout his course of treatment of appellant.

*Imputation to Dr. Fogarty*

■ We agree that Dr. Feagin's course of treatment should be imputed to Dr. Fogarty. This approach is consistent with our prior decisions concerning the continuous treatment rule. In *Metzger v. Kalke*, supra, 709 P.2d at 417, we observed that the effect of an erroneous diagnosis may continue long after the diagnosis is actually made:

> " [E]ach time an incorrect diagnosis was made and an incorrect treatment applied, plaintiff's injuries were extended. *It was not the error in the diagnosis originally made by defendant but its adherence thereto and course of treatment that brought about the injuries.*' " (Emphasis added.) (Quoting *Williams v. Elias*, 140 Neb. 656, 1 N.W.2d 121 (1941))

In the present case, it was Dr. Feagin's adherence to Dr. Fogarty's diagnosis which dictated the nature and duration of appellant's treatment. In *Echols v. Keeler*, supra, 735 P.2d at 731–32, we adopted the rationale that " 'it would be absurd to require a wronged patient to interrupt corrective efforts by serving a summons on the physician.' " 1 D. Louisell and H. Williams, Medical Malpractice, ¶ 13.08 (1986). It would be no less absurd to require a patient to interrupt corrective efforts by serving a summons upon a pathologist while the patient's treating physician is continuing to rely upon that pathologist's diagnosis. It cannot be said that Dr. Fogarty no longer assisted in treating Ms. Sharsmith after making his diagnosis, or that he was no longer associated with Dr. Feagin. Until the alleged misdiagnosis was corrected, or until Dr. Feagin ceased to rely upon it, Dr. Fogarty's constructive

involvement in that treatment was sufficient to constitute the requisite assistance or association and prevent the running of the statute of limitations. We conclude that, for purposes of the statute of limitations, Dr. Feagin's course of treatment should be imputed to Dr. Fogarty, " 'on the grounds of fairness as well as on the basis of logic.' " *Echols v. Keeler*, supra at 731, quoting 1 Louisell and Williams, Medical Malpractice, ¶ 13.08 (1986). Appellant's claim against Dr. Fogarty and her corresponding vicarious liability claim against St. John's Hospital are not barred by the statute of limitations.

*Imputation to Dr. Hill*

■ The case for imputation of Dr. Feagin's course of treatment to Dr. Hill is more tenuous, as the continued reliance factor is not as certain. Although Dr. Feagin relied upon Dr. Hill's frozen section diagnosis during surgery, portions of his deposition testimony suggest that he did not treat it as a definitive diagnosis. Dr. Feagin noted that "a frozen section is a rapid, incomplete analysis, and it's a guideline but it's not a definitive diagnosis." Dr. Feagin also stated that a frozen section diagnosis is not always clinically accurate and that is the reason for permanent section microscopic diagnosis.

Other portions of Dr. Feagin's deposition testimony suggest that he might have relied on the conclusions of both pathologists in determining appellant's treatment. Moreover, the written pathological report, although signed only by Dr. Fogarty, contained Dr. Hill's diagnosis as well. In light of this evidence, the extent of Dr. Feagin's continued reliance on Dr. Hill's frozen section diagnosis, although potentially slight, is sufficiently unsettled to preclude summary judgment. Consequently, we cannot affirm the summary judgment in favor of Dr. Hill on statute of limitations grounds. This conclusion also applies to the vicarious liability claim against the hospital relating to Dr. Hill.

*Direct Negligence of the Hospital*

■ In her direct negligence claim against the hospital, appellant contends

that the hospital failed to engage in adequate peer review procedures. Appellant has not explained how the continuous treatment rule would apply to this particular claim, and we do not think it is applicable.

We cannot agree, however, with the hospital's assertion that the statute began to run when appellant was discharged. As far as we can tell from the record, the hospital's alleged act, error or omission—failure to ensure adequate supervision and review of the case—had not even occurred at that point. Moreover, we cannot discern the time when appellant discovered the hospital's alleged failure to supervise or review her treatment. Appellant amended her complaint to include that claim on February 19, 1986, nearly four years after her discharge from the hospital and over a year after she filed her initial complaint. While certainly not dispositive of the question, this fact at least suggests that the discovery provisions of the statute of limitations might be of some assistance to appellant.

It appears that these factual issues concerning the statute of limitations need further development in the trial court. Accordingly, we cannot conclude that the statute of limitations had run on the direct negligence claim against the hospital.

## ISSUES OF FACT

### Negligence of Dr. Fogarty

■ In support of his motion for summary judgment, Dr. Fogarty submitted the affidavit of Dr. Robert H. Fennell, who stated that Dr. Fogarty's diagnosis of the tumor as a neurilemoma did not fall below the standard of care and that "it is not negligent or below the standard of care for a board certified pathologist to decide not to send histological slides out to a 'consultant' for a second opinion." Dr. Charles Garrett, appellant's expert pathologist, testified in his deposition that the slides reviewed by Dr. Fogarty contained "worrisome" signs which should have caused concern about potential malignancy of the tissue and, as a result, the standard of care would mandate referral to a soft tissue tumor specialist. Dr. Garrett further indicated that if consultation had been obtained from a facility specializing in soft tissue tumors, a misdiagnosis would have been highly unlikely. These materials demonstrate a factual dispute on the question of whether Dr. Fogarty acted negligently in failing to obtain consultation from a specialist.

### Negligence of Dr. Hill

In his deposition, Dr. Hill indicated that he did not remember whether he performed a microscopic analysis during his frozen section diagnosis. The pathology report does not contain a microscopic analysis of the frozen section. Appellant claims that Dr. Hill was negligent in either failing to perform a microscopic analysis of the frozen section or failing to record his findings in that regard. Dr. Garrett, appellant's expert pathologist, testified that when a pathologist does a frozen section he makes a slide and looks at it under the microscope. He further testified that the failure to dictate microscopic findings was a departure from the standard of care. In response, Dr. Hill contends that the appellant's injuries could not have been caused by his conduct because Dr. Feagin did not continue to rely on the frozen section diagnosis after Dr. Fogarty completed the more reliable permanent section diagnosis.

■ We have already concluded that the extent of Dr. Feagin's continued reliance on Dr. Hill's frozen section diagnosis has not been conclusively determined. In addition, the possibility exists that, if Dr. Hill had performed a microscopic analysis and written down his findings, Dr. Fogarty might have been alerted to a potential problem and his diagnosis might have been affected. These questions present genuine issues of material fact.

### Vicarious Liability of St. John's Hospital

Traditionally, a hospital can be held vicariously liable for the negligence of its employees, but not for the negligence of physicians who are independent contractors. See *Parker v. Haller*, Wyo., 751 P.2d 372 (1988). Appellant does not contend

that Dr. Fogarty is an employee of the hospital. Instead, she urges us to adopt the apparent agency rule, which imposes vicarious liability against hospitals for the negligence of those practitioners who are the ostensible or apparent agents of the hospital, regardless of whether they are employees or independent contractors. See 51 A.L.R. 4th 235, § 7 (1987); Louisell and Williams, supra, ¶ 16.08[3].

■ This theory of liability, which has gained widespread acceptance, stems from judicial recognition that hospitals are "corporate entities capable of acting only through human beings whose services the hospital engages" and that hospitals derive financial profit by holding "themselves out to the public as offering and rendering quality health care services." *Hardy v. Brantley*, Miss., 471 So.2d 358, 371, 51 A.L.R. 4th 205 (1985). The rule has been stated in the following terms:

"Where a hospital holds itself out to the public as providing a given service, * * * and where the hospital enters into a contractual arrangement with one or more physicians to direct and provide the service, and where the patient engages the services of the hospital without regard to the identity of a particular physician and where as a matter of fact the patient is relying upon the hospital to deliver the desired health care and treatment, the doctrine of respondeat superior applies and the hospital is vicariously liable for damages proximately resulting from the neglect, if any, of such physicians." 471 So.2d at 371.

The apparent agency rule is supported by well-established tort and agency law principles. The Restatement, Second, Torts, § 429, p. 421 (1965) provides:

"One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants."

Section 267 of the Restatement, Second, Agency (1958) provides:

"One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such." Id. at 578.

The foregoing authorities are persuasive. We hold that the apparent agency rule is appropriate in this case. Because the record demonstrates genuine fact issues concerning this theory, summary judgment was inappropriate.

*Direct Negligence of St. John's Hospital*

Appellant contends that, in addition to any potential vicarious liability, the hospital itself owes an independent duty to exercise reasonable care to prevent negligent treatment by its staff physicians. More specifically, appellant argues that if adequate peer review procedures were followed within the hospital, the alleged misdiagnosis would have been discovered and appropriate consultation would have been obtained.

In support of this claim, appellant relies on *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 211 N.E.2d 253, 14 A.L.R.3d 860 (1965), cert. denied 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966), in which a court, for the first time, held that a hospital has a direct duty to provide quality medical care. Since the *Darling* decision, a number of courts have premised hospital liability on either the failure to select or appoint competent staff physicians or the failure to adequately supervise treatment rendered by staff physicians. See 51 A.L.R.3d 981 (1973); 12 A.L.R. 4th 57 (1982).

■ In *Greenwood v. Wierdsma*, Wyo., 741 P.2d 1079 (1987), we recognized that a hospital has a legal duty "to exercise that degree of care and skill usually exercised or maintained by other reputable hospitals in the extension and continuation of medi-

cal staff privileges to physicians." Id. at 1088. We held that this duty was apparent from the language of W.S. 35–2–601.[1] We also noted that the preservation of quality health care for Wyoming citizens was an important public policy, and we quoted the following judicial observation:

> " 'Having undertaken one of mankind's most critically important and delicate fields of endeavor, concomitantly therewith the hospital must assume the grave responsibility of pursuing this calling with appropriate care. The care and service dispensed through this high trust, however technical, complex and esoteric its character may be, must meet standards of responsibility commensurate with the undertaking to preserve and protect the health, and indeed, the very lives of those placed in the hospital's keeping.' *Beeck v. Tucson General Hospital,* 18 Ariz.App. 165, 500 P.2d 1153, 1157 (1972), quoted in *Johnson v. Misericordia Community Hospital,* supra [97 Wis.2d 521,] 294 N.W.2d [501] at 510–511 [ (1980) ]." 741 P.2d at 1089.

These considerations convince us that a hospital should be required to exercise reasonable care not only in determining whether to extend or continue staff privileges, but also in maintaining adequate supervision and review of treatment rendered by those physicians. Accordingly, we join those jurisdictions which impose upon a hospital a duty of exercising reasonable care in supervising and reviewing the treatment of patients by its staff physicians. See 12 A.L.R. 4th 57.

In defining the parameters of this duty, other jurisdictions have recognized that hospitals exercise only a limited degree of control over the details of the work performed by its staff physicians. Consequently, they have held that the hospital is liable only if it knows or should know of the deficient treatment or if the physician's negligence is obvious. See *Schoening v. Grays Harbor Community Hospital,* 40 Wash.App. 331, 698 P.2d 593 (1985); *Braden v. Saint Francis Hospital,* Colo.App., 714 P.2d 505 (1985); *Fridena v. Evans,* 127 Ariz. 516, 622 P.2d 463, 12 A.L.R. 4th 46 (1980); *Pickle v. Curns,* 106 Ill.App.3d 734, 62 Ill.Dec. 79, 435 N.E.2d 877 (1982); *Killeen v. Reinhardt,* 71 A.D.2d 851, 419 N.Y. S.2d 175 (1979). We favor this approach, and we hold that St. John's may be liable for negligent supervision of the pathologists in this case only if appellant can demonstrate obvious negligence or show that the hospital knew or should have known of negligent treatment or procedures.

## Causation and Harm

Appellees contend that the evidence demonstrates the absence of a genuine issue of material fact concerning causation and injury, suggesting that appellant would have opted for amputation if the original diagnosis had revealed a malignancy. This suggestion ignores the evidence in the record indicating that appellant had to undergo the second biopsy and tumor removal surgery with accompanying pain and expense, and that the level of concern for metastatic disease was increased by recurrence of the tumor, thereby possibly contributing to the decision to amputate as well as causing possible emotional and mental trauma. This evidence demonstrates a genuine fact issue on the question of whether appellees' allegedly negligent conduct caused harm to appellant.

Reversed for further proceedings in accordance with this opinion.

---

1. W.S. 35–2–601, provides:
   "Subject to by-laws and control by the hospital governing body, the medical staff committees of any hospital shall have access to the records, data and other information relating to the condition and treatment of patients in any such hospital in this state, for the purposes of supervision, discipline, admission, privileges or control of members of such hospital's medical staff; evaluating, studying and reporting on matters relating to the care and treatment of such patients and patients generally, research, reducing mortality, prevention and treatment of diseases, illnesses and injuries; and determining if a hospital and extended care facilities are being properly utilized."