# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 66

### APRIL TERM, A.D. 2013

### May 28, 2013

TED NOBLES,

Appellant
(Plaintiff),

v.

MEMORIAL HOSPITAL OF LARAMIE
COUNTY, d/b/a UNITED MEDICAL CENTER
and d/b/a CHEYENNE REGIONAL MEDICAL
CENTER; and THE BOARD OF TRUSTEES OF
MEMORIAL HOSPITAL OF LARAMIE
COUNTY, d/b/a UNITED MEDICAL CENTER
and d/b/a CHEYENNE REGIONAL MEDICAL
CENTER,

Appellees
(Defendants).

No. S-12-0054

*Appeal from the District Court of Laramie County*
*The Honorable Peter G. Arnold, Judge*

*Representing Appellant:*

*Donald J. Sullivan, Sullivan Law Offices, PC, Cheyenne, Wyoming.*

*Representing Appellees:*

*Matthew C. Miller and Traci L. Van Pelt, McConnell Fleischner Houghtaling, LLC, Denver, Colorado. Argument by Ms. Van Pelt.*

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BURKE, Justice.**

[¶1]    In this medical malpractice case, the district court granted summary judgment against Appellant, Ted Nobles, and in favor of Appellees (Hospital), after determining that Mr. Nobles did not present his claim within the time specified in the applicable statute of limitations. Mr. Nobles appealed. We will reverse.

### *ISSUES*

[¶2]    The parties present three issues:

> 1.    Whether the district court erred by failing to apply the continuous treatment rule?
>
> 2.    Whether the single act exception to the continuous treatment rule is recognized in Wyoming, and if so, whether it applies in this case.
>
> 3.    Whether the district court erred in granting summary judgment to the Hospital.

### *FACTS*

[¶3]    Mr. Nobles, a resident of the State of Washington, was travelling with his "significant other," Dr. Janet Arnold,[1] when he became ill in Rawlins, Wyoming, on December 21, 2007. He experienced respiratory difficulty, vomited, and passed out. He was taken to the emergency room of the Rawlins Hospital where he was intubated to relieve the respiratory distress, sedated, and stabilized with intravenous medication. He was then transported by ambulance to Cheyenne.

[¶4]    Mr. Nobles was admitted to the intensive care unit of the hospital in Cheyenne, with a diagnosis of acute respiratory failure with bilateral pulmonary edema resulting from pneumonia. He remained intubated, and at some point also needed mechanical ventilation. He eventually received a tracheotomy. While in the intensive care unit, he also developed renal failure. He was placed on continuous renal replacement therapy, and later on hemodialysis. He also experienced complications relating to his diabetes.

[¶5]    While in the intensive care unit, Mr. Nobles also began complaining of pain in his

---

[1] Some hospital documents indicate that Dr. Arnold and Mr. Nobles are married. Dr. Arnold's affidavit suggests otherwise. The exact nature of their relationship is immaterial to this case.

1

right shoulder. On February 10, 2008, he told his hospitalist that the shoulder "may have been injured while he was being moved." On February 13, 2008, the hospitalist's notes indicate that Mr. Nobles said his "shoulder hurts since a fall in ICU." On February17, 2008, the doctor noted right shoulder pain and reduced mobility, and said Mr. Nobles "Relates it to being tugged at in the ICU." X-rays of the shoulder "showed mild subluxation without any fracture evident." An MRI was ordered, but not done immediately because of Mr. Nobles' claustrophobia.

[¶6]    Mr. Nobles responded favorably to therapy and treatment, and on February 19, 2008, he was transferred to the hospital's transitional care unit, located in a separate building from the intensive care unit. However, he continued to complain of pain in his right shoulder and arm. A consulting physician who reviewed Mr. Nobles' case on February 20, 2008 wrote that Mr. Nobles:

> reports that while in the ICU someone pulled on his arm and twisted in order to try and pull him up in the bed and he, at that time, felt pain in his arm and shortly thereafter noted dysfunction of the right upper arm. His wife, who is a family practice physician notes that he does have a history of some mild osteoarthritis in bilateral shoulders but otherwise had totally normal arm and shoulder function prior to this incident. Mr. Nobles notes that at this point at rest he does not have much pain but he has pain with attempted movement. He has essentially no flexion of the biceps. He is unable to forward flex or abduct his arm whatsoever although he does have triceps extension and wrist flexion and extension and some limited weak pronation and supination. Apparently he had x-rays while at [the hospital] and per his wife, they showed a subluxation but no true dislocation and no fractures.

The consulting physician questioned whether there might be a "rotator cuff tear versus brachial plexus injury versus cervical nerve root injury or some combination of the three." He recommended an MRI, an electromyogram, and nerve conduction velocity studies.

[¶7]    According to affidavits submitted by Mr. Nobles and Dr. Arnold, as Mr. Nobles continued experiencing pain and dysfunction in his right shoulder and arm, the doctors said they thought the problems might be the result of a stroke. An MRI of the brain was conducted, but apparently did not indicate that Mr. Nobles had suffered a stroke. Throughout his stay in the transitional care unit, Mr. Nobles was given a program of physical and occupational therapy to improve the function and condition of his hand, arm, and shoulder.

2

[¶8]    Mr. Nobles was discharged from the hospital on March 15, 2008.  His attending physician wrote:

> When he arrived here he was hardly able to move at all, even his extremities. . . .  Within the first week, however, he had started moving his extremities.  He was sitting up.  He was transferring.  Unfortunately he was not able to move his right shoulder at all.  He was able to move his right hand a little bit.  We did obtain an MRI that showed complete denervation of the right shoulder.  We did have neurology consultation and they concurred with this diagnosis and this was going to be an ongoing difficulty over the next several months that will need close follow up with a neurologist in his home town.

Mr. Nobles did follow up with further medical treatment when he got home.  There, his doctors diagnosed a brachial plexus[2] injury to his right shoulder and arm.

[¶9]    On March 11, 2010, Mr. Nobles presented his claim to the Hospital as required by the Wyoming Governmental Claims Act, Wyo. Stat. Ann. § 1-39-113(a).  The same day, he filed a notice of claim against the Hospital with the Wyoming Medical Review Panel.[3]  The Hospital waived review and the Panel entered an order authorizing Mr. Nobles to file suit against the Hospital.  Mr. Nobles filed his complaint on June 11, 2010, alleging that he had "sustained serious injury and damage to his right (dominant) arm, shoulder and brachial plexus."  He further alleged that this injury was the result of the Hospital's negligence in allowing a single staff member to move or attempt to move him in the hospital bed, in failing to provide adequate staff and personnel to move him in the hospital bed safely, and in "[m]oving and/or attempting to move the patient in the hospital bed by pulling and yanking on the patient's arm."

[¶10]  The Hospital responded with a motion to dismiss, or, in the alternative, a motion for summary judgment, claiming that Mr. Nobles had not filed his suit within the time period specified in the applicable statute of limitations.  Because the Hospital had supported its motion with portions of Mr. Nobles' medical records, the district court treated the motion as one for summary judgment, and provided Mr. Nobles an

---

[2] The word brachial refers to the arm.  *Stedman's Medical Dictionary* 231 (27th ed. 2000).  A plexus is a "network or interjoining of nerves and blood vessels."  *Id*. at 1400.  In his brief, Mr. Nobles describes the injury as "essentially, the nerves in his shoulder had been torn apart, resulting in a brachial plexus injury."

[3] Pursuant to Wyo. Stat. Ann. §§ 9-2-1518 and -1519, such a claim is a prerequisite to initiating medical malpractice litigation under most circumstances.

opportunity to respond with evidence in opposition to the motion. Mr. Nobles filed affidavits from Dr. Arnold and himself. After hearing arguments and considering the motion, the district court granted summary judgment in favor of the Hospital. Mr. Nobles challenges that decision in this appeal.

## *STANDARD OF REVIEW*

[¶11] We review a district court's decision to grant or deny summary judgment using the following standard of review:

> Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c); *Metz Beverage Co. v. Wyoming Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo. 2002). "A genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Id*. Because summary judgment involves a purely legal determination, we undertake *de novo* review of a trial court's summary judgment decision. *Glenn v. Union Pacific R.R. Co.*, 2008 WY 16, ¶ 6, 176 P.3d 640, 642 (Wyo. 2008).

*Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC*, 2008 WY 101, ¶ 8, 191 P.3d 125, 128-29 (Wyo. 2008). In performing our *de novo* review, we "view the record in the light most favorable to the party opposing summary judgment, giving that party the benefit of all favorable inferences reasonably drawn from the record. Any doubts about the existence of a genuine issue of material fact must be resolved against the party seeking summary judgment." *Elk Ridge Lodge, Inc. v. Sonnett*, 2011 WY 106, ¶ 9, 254 P.3d 957, 960 (Wyo. 2011).

## *DISCUSSION*

### *I. Applicable Statute of Limitations*

[¶12] There are two statutes of limitations at issue in this case. The statute of limitations for professional negligence is set forth in Wyo. Stat. Ann. § 1-3-107(a)(i) (LexisNexis 2007). In pertinent part, it provides that "(a) A cause of action arising from an act, error or omission in the rendering of licensed or certified professional or health care services shall be brought . . . (i) Within two (2) years of the date of the alleged act, error or omission." The period for submitting a claim to a governmental entity is set forth in Wyo. Stat. Ann. § 1-39-113(a), and it provides in relevant part: "(a) No action shall be brought under this act against a governmental entity unless the claim upon which the

4

action is based is presented to the entity as an itemized statement in writing within two (2) years of the date of the alleged act, error or omission." The operative language of the two statutes is identical. Both provide that the claim or action must be filed within "two (2) years of the date of the alleged act, error or omission."

[¶13] Mr. Nobles presented his claim to the Hospital, as required by the Wyoming Governmental Claims Act, on March 11.[4] On the same day, he filed his claim with the Wyoming Medical Review Panel.[5] That date, March 11, 2010, is the pertinent date under both statutes.

[¶14] Mr. Nobles' malpractice claim is based on allegations that a hospital employee attempted to move him in bed by pulling, tugging, or twisting on his right arm. It is undisputed that, if this occurred, it was while Mr. Nobles was in the intensive care unit. Mr. Nobles was transferred from the intensive care unit on February 19, 2008. He filed his claim on March 11, 2010, two years and twenty-one days after he left the intensive care unit. The Hospital maintains that this filing was more than two years after the latest possible date of any pulling on his arm, and accordingly, that Mr. Nobles failed to commence his lawsuit within the time period specified in the statutes of limitations.

[¶15] Mr. Nobles responds that Wyoming has adopted the "continuous treatment rule," under which "the act, error or omission which starts the running of the statute of limitations against medical malpractice actions is the termination of the course of treatment for the same or related illnesses or injuries." *Metzger v. Kalke*, 709 P.2d 414, 417 (Wyo. 1985). Mr. Nobles asserts that the Hospital continued treating him for the alleged injuries to his arm and shoulder until his discharge from the hospital on March 15, 2008. Applying the continuous treatment rule, Mr. Nobles contends that his claim is not barred because it was commenced within two years after the termination of his course of treatment by the Hospital.

---

[4] The Wyoming Governmental Claims Act requires an action to be filed in court within one year after presenting a claim. Wyo. Stat. Ann. § 1-39-114. It is undisputed that Mr. Nobles filed his action within this time limit.

[5] Mr. Nobles did not file his action in district court until June 11, 2010. However, Wyo. Stat. Ann. § 9-2-1518 states that "[t]he running of the applicable limitation period in a malpractice action is tolled upon receipt by the director [of the Wyoming Medical Review Panel] of the claim and does not begin again until thirty (30) days after the panel's final decision, or seventy-five (75) days after the panel's last hearing, whichever occurs earlier." Mr. Nobles filed a notice of claim with the Panel on March 11, 2010 which began tolling the running of the limitation period. The Panel entered its order on May 17, 2010, and Mr. Nobles filed his complaint in the district court within thirty days of the Panel's decision. Thus, the effective date for purposes of this case is the date he filed his claim with the Panel, or March 11, 2010.

[¶16] The Hospital asserts that the continuous treatment rule should not apply in Mr. Nobles' case. It also contends that, even if the continuous treatment rule applies, there is a "single act exception" to the rule. According to the Hospital, if there was malpractice in Mr. Nobles' case, it was a single, identifiable act, and the statute of limitations began to run when that act occurred. Again, it is undisputed that the tugging, pulling, and twisting of Mr. Nobles' arm occurred, if at all, prior to his transfer from the intensive care unit on February 19, 2008. If the single act exception applies here, Mr. Nobles' commencement of the lawsuit on March 11, 2010, was too late.

## II. *Continuous Treatment Rule*

[¶17] We adopted the continuous treatment rule in *Metzger*, 709 P.2d at 417. In that case, Ms. Metzger had been a patient of Dr. Hussain at the Medical Center for Women from December, 1979, until May 12, 1981, when the doctor moved to another state. Ms. Metzger remained a patient of the Medical Center for Women and her care was transferred to Dr. Kalke. She remained under the care of Dr. Kalke until September 28, 1981. In December, 1981, another doctor diagnosed Ms. Metzger with a pituitary tumor requiring surgical removal. On September 13, 1983, Ms. Metzger filed suit against Drs. Hussain and Kalke and the Medical Center for Women, claiming damages suffered as a result of the undiagnosed tumor. The doctors asserted that the misdiagnosis, if any, occurred prior to September 13, 1981, and that the claim was barred by the two-year statute of limitations set forth in Wyo. Stat. Ann. § 1-3-107(a). The district court agreed, and ruled against the Metzgers. *Id*. at 415-16.

[¶18] The Metzgers appealed, asking the Court "to determine whether the trial court erred in its application of § 1-3-107." *Id*. at 416. We held with regard to Dr. Kalke and the Medical Center for Women that the Metzgers "timely brought suit on September 13, 1983, to recover for conduct occurring prior to September 13, 1981, since the cessation of treatment on September 28, 1981 completed the act which started the running of the two-year statute of limitations." *Id*.[6] We explained:

> Courts which have addressed the issue uniformly hold that where the defendant physician has provided a continuing course of care for the same or related complaints, the cessation of treatment completes the "act" which starts the running of the statutory period for filing suit. The courts

---

[6] We also ruled that the Metzgers "timely filed their actions against appellee [Dr.] Hussain within the two-and-one-half-year limitation period set out in [Wyo. Stat. Ann.] § 1-3-107(a)(iv) for wrongdoing discovered during the second year following its occurrence." *Id*. at 416. That statutory provision is not at issue in the case now before us.

reason that the medical treatment and employment should be considered as a whole and if malpractice occurred during its course, the statute of limitations begins to run when the treatment terminates. The Supreme Court of Nebraska set out the rationale for this "continuous treatment" rule in *Williams v. Elias*, [140 Neb. 656, 662,] 1 N.W.2d [121,] 124 [(1941)]:

> "* * * In the treatment of a patient the diagnosis might change from time to time, and it is commonly accepted in the medical profession that the diagnosis, in the first instance, is not binding on the physician. He should have the right, during the course of treatment, to change the diagnosis. * * *

> "* * * The diagnosis referred to was a continuing biweekly one, and each time an incorrect diagnosis was made and an incorrect treatment applied, plaintiff's injuries were extended. It was not the error in the diagnosis originally made by defendant but its adherence thereto and course of treatment that brought about the injuries."

We hold with the foregoing authorities that the act, error or omission which starts the running of the statute of limitations against medical malpractice actions is the termination of the course of treatment for the same or related illnesses or injuries. Accordingly, the limitation period established by § 1-3-107(a) began to run with respect to appellants' claims against Dr. Kalke on September 28, 1981, the date he last treated Carolyn Metzger. Appellants timely filed their complaints against Kalke and the Medical Center for Women on September 13, 1983, within the two years allowed by subsection (a)(i).

*Metzger*, 709 P.2d at 417 (some internal citations omitted). Since *Metzger*, we have applied the continuous treatment rule in at least three other decisions. *Echols v. Keeler*, 735 P.2d 730, 731-32 (Wyo. 1987); *Sharsmith v. Hill*, 764 P.2d 667, 669-71 (Wyo. 1988); and *Jauregui v. Memorial Hospital*, 2005 WY 59, ¶¶ 9-15, 111 P.3d 914, 917-19 (Wyo. 2005).

[¶19] In response to the Hospital's motion for summary judgment, Mr. Nobles presented evidence that would bring his case within the continuous treatment rule. Because he is opposing summary judgment, we must view this evidence in the light most favorable to

7

Mr. Nobles. In their affidavits, Mr. Nobles and Dr. Arnold state that Mr. Nobles was a patient of the Hospital from December 21, 2007, until March 15, 2008. There is evidence that he was given continuing care for the pain and dysfunction in his right shoulder and arm until he was discharged from the hospital. In particular, the Hospital attempted to diagnose the problems with Mr. Nobles' shoulder and arm, and provided physical and occupational therapy in order to treat the problems. He left the care of the Hospital on March 15, 2008. At that time, Mr. Nobles' arm and shoulder problems had not resolved. He was advised to seek continued treatment for those problems. There is sufficient evidence in the record to establish a question of fact as to whether his discharge was the termination of his course of treatment, and therefore the completion of the act, error, or omission that is the basis of his claim against the Hospital.

[¶20] The Hospital presents several theories which would render the continuous treatment rule inapplicable in this case. It first asserts that "the record is replete" with evidence that Mr. Nobles had "knowledge of his cause of action prior to February 19, 2008, and certainly prior to March 11, 2008." According to the Hospital, we recently established that "[i]t appears from a plain reading of Wyo. Stat. Ann. § 1-3-107 that the time for filing suit is governed by the date when the 'act, error or omission' occurs, rather than the date when the cause of action accrues." *Adelizzi v. Stratton*, 2010 WY 148, ¶ 12, 243 P.3d 563, 566 (Wyo. 2010), quoting *Lucky Gate Ranch, L.L.C. v. Baker & Associates*, 2009 WY 69, ¶ 19, 208 P.3d 57, 65 (Wyo. 2009). According to the Hospital, the tugging, pulling, and twisting on Mr. Nobles' arm is the act, error, or omission at issue, and Mr. Nobles was aware of that activity when it occurred. The Hospital argues that "whether [Mr.] Nobles had sustained any injury on the date of the 'twisting' or 'pulling' or whether he knew of any injury or its cause is of no consequence when interpreting whether the professional negligence statute commences to run."

[¶21] The Hospital is correct about our holding in *Adelizzi*. We stated that the professional or health care services statute of limitations is triggered by the act, error, or omission. This is in contrast to statutes of limitations for other causes of action in which "the concept of 'when the cause of action accrues,'" defines the start of the period of limitation. *Adelizzi*, ¶ 13, 243 P.3d at 566. However, the Hospital has failed to grasp the significance of the last sentence in that same paragraph: "The statute of limitations began to run in this case on June 1, 2006, *the last day that McGill performed professional services for the Adelizzis under* their agreement." *Id*. (emphasis added).[7] That conclusion is entirely consistent with our previous statements in medical malpractice cases that the statute of limitations begins to run at the "cessation of treatment." *Metzger,*

---

[7] *Adelizzi* involved professional services provided by a real estate agent and broker. Whether a rule analogous to the continuous treatment rule applies to these services is not at issue in this case, and we do not decide that question here.

709 P.2d at 417. *See also Echols*, 735 P.2d at 731 ("'Termination' of treatment" starts the statute of limitations.); *Jauregui*, ¶ 9, 111 P.3d at 917 (In *Metzger*, we "defined the 'act, error or omission which starts the running of the statute of limitations against malpractice actions' as 'the termination of the course of treatment for the same or related illnesses or injuries.'").

[¶22]   The Hospital focuses solely on the pulling and twisting of Mr. Nobles' right arm, and contends that the pulling and twisting was the act triggering the running of the statute of limitations.   Under the continuous treatment rule, however, the act was not completed the moment the Hospital employee stopped the pulling and twisting.   As we said in *Metzger*, 709 P.2d at 417, "the cessation of treatment completes the 'act' which starts the running of the statutory period for filing suit."   The act was not completed until the termination of the Hospital's treatment of the shoulder and arm.   There is evidence in the record supporting Mr. Nobles' contention that such treatment did not end until the day of his discharge.

[¶23]   Next, the Hospital argues that the district court properly found that the continuous course of treatment rule did not apply in this case.   In its order granting summary judgment, the district court wrote:

> Plaintiff claims that summary judgment is not appropriate because of the application of the continuous course of treatment doctrine.   The continuous course of treatment doctrine provides that "where the defendant physician has provided a continuing course of care for the same or related complaints, the cessation of treatment completes the 'act' which starts the running of the statutory period for filing suit." *Metzger v. Kalke*, 709 P.2d 414, 417 (Wyo. 1985).   The Plaintiff claims that the statute of limitations runs from the time that . . . he was released from the TCU, which would be on March 15, 2008.   However, Plaintiff does not allege that any instances of tugging on his arm occurred after he was moved to the TCU.   Rather, in Plaintiff's affidavit, he states that "**While I was in the ICU**, there were several occasions when a male aide came in, alone, to move me or reposition me in the ICU bed.   On each occasion, this person pulled on my arm, it was very painful." (Nobles Aff. ¶ 4) (emphasis added).
>
> The continuous course of treatment doctrine originated in *Metzger v. Kalke*, 709 P.2d 414 (Wyo. 1985).   In *Metzger*, the Court identified the rationale behind the rule was that a medical professional should be allowed to change the

9

diagnosis of the patient over time. *Metzger*, 709 P.2d at 417 (quoting *Williams v. Elias*, 1 N.W.2d 121, 124 (Neb. 1941). This was done because the plaintiff in *Metzger* could not identify the exact point in time he was injured by the physician. When applying the rule in a later case, the Wyoming Supreme Court stated that the "policies behind the continuous treatment rule would not be served" by applying it in a situation where the "plaintiff . . . is not prejudiced by an inability to identify the treatment which might have caused his harm. . . ." *Echols v. Keeler*, 735 P.2d 730, 732 (Wyo. 1987). The Eighth Circuit Court of Appeals stated that "where . . . a patient is able to identify the specific negligent treatment that caused his/her injury, the continuous treatment doctrine does not toll the statute of limitations." *Roberts v. Francis*, 128 F.3d 647, 651 (8th Cir. 1997). In addition, this Court recognizes that any negligence that occurred in the instant case was not regarding diagnosis, but an injury to the Plaintiff caused by an aide. Therefore, the continuous course of treatment doctrine does not apply to the case at bar.

[¶24] The continuous treatment rule is, in at least three respects, not as limited as the district court ruled. First, while *Metzger* discussed reasons the rule should apply in cases where a patient is misdiagnosed, it contained no indication that it applies only in misdiagnosis cases. In *Echols*, 735 P.2d at 731, we discussed reasons the rule should also apply in a case involving treatment:

These policy considerations are also discussed in 1 D. Louisell and H. Williams, Medical Malpractice, ¶ 13.08 (1986):

The so-called continuous treatment rule has been defended on the grounds of fairness as well as on the basis of logic. Certainly it would not be equitable to bar a plaintiff who, for example, has been subjected to a series of radiation treatments in which the radiologist negligently and repeatedly administered an overdosage, simply because the plaintiff is unable to identify the one treatment that produced his injury. Indeed, in such a situation no single treatment did cause the harm; rather it was the result of several treatments, a cumulative effect.

(Quotation marks omitted.) In *Jauregui*, we applied the continuous treatment rule in a

10

case involving treatment:

> The continuous treatment doctrine directly applies to the instant case. Dr. Oliver's treatment to repair Mr. Jauregui's torn rotator cuff tendon did not end with the first surgery. Dr. Oliver continued to treat Mr. Jauregui specifically with regard to his rotator cuff tendon surgery. Dr. Oliver treated the immediately ensuing infection, and Dr. Oliver performed the second surgery wherein the surgical sponge was removed. Each treatment up to the second surgery on February 26 was directly connected to the initial surgery. Thus, the act constituting the final act in the course of treatment for the surgical repair of Mr. Jauregui's torn rotator cuff was the second surgery. The statute of limitation thus began to run as of the date of the second surgery.

*Id.*, ¶ 10, 111 P.3d at 917. The continuous treatment rule is not limited to cases involving misdiagnosis.

[¶25] Second, the district court was correct that, in *Echols*, 735 P.2d at 732, we stated that the "policies behind the continuous treatment rule would not be served" by applying it in a situation where the plaintiff "is not prejudiced by an inability to identify the treatment which might have caused his harm." However, that statement should be considered in context. In *Echols*, the appellant was treated for several months for a back injury by a chiropractor, Dr. Keeler. Then, "[a]fter October 6, 1981, appellant had no further contact with Dr. Keeler." *Id.* at 730. Shortly thereafter, the appellant was hospitalized for bladder problems. He was examined by Dr. Cole, who referred him to Dr. Gordy, who performed surgery on his back. "Tissue samples obtained during the surgery revealed a bacterial infection in appellant's spine. After the surgery, appellant was treated by Dr. Landon and two other specialists, Dr. Bailey and Dr. Lyford, for the damage caused by the infection." *Id.* at 730-31. The appellant eventually filed a malpractice claim against the chiropractor, Dr. Keeler, claiming negligence in the diagnosis and treatment of his back injury. Although suit was filed approximately three and a half years after he had last been seen by Dr. Keeler, the appellant contended "that he is receiving a continuous course of treatment from Drs. Keeler, Landon, Cole, Lyford, and Bailey for the same injury which is the subject of this action and that, therefore, the two-year statute of limitations had not run at the time of filing his complaint." *Id.* at 731.

[¶26] We rejected this interpretation of the continuous treatment rule. Quoting *Metzger*, we said that "the act, error or omission which starts the running of the statute of limitations against medical malpractice actions is the termination of the course of treatment for the same or related illnesses or injuries." *Echols*, 735 P.2d at 731. "'Termination' of treatment," we explained, "has reference to the practitioner against

11

whom claim is made." *Id*. After quoting the applicable policy considerations, we said:

> The policies behind the continuous treatment rule would not be served by applying it in the manner suggested by appellant in this case. Plaintiff here is not prejudiced by an inability to identify the treatment which might have caused his harm, nor is there anything in the record to suggest that Dr. Keeler had any desire to retain appellant as a patient and correct any error he might have made.
>
> For purposes of appellant's malpractice action against Dr. Keeler, the only relevant course of treatment began on September 11, 1981, when appellant first visited Dr. Keeler and ended, at the latest, on October 6, 1981, when appellant last saw Dr. Keeler. After referral, Dr. Keeler did not continue as appellant's doctor nor was he associated with or engaged in assisting the doctors thereafter treating appellant.

*Id*. at 732.

[¶27] The policies behind the continuous treatment rule were not served in *Echols* because the appellant had not been continuously treated by Dr. Keeler. Significantly, we did not rule that the statute of limitations began to run as soon as the appellant was able "to identify the treatment which might have caused his harm." *Id*. Rather, we noted that appellant last saw Dr. Keeler on October 6, 1981, and applied the continuous treatment rule to conclude that "the statute began to run, at the very latest, on October 6, 1981." *Id.* The limitation we observed in *Echols* – limiting the continuous treatment rule by "reference to the practitioner against whom claim is made" – does not apply in Mr. Nobles' case.

[¶28] Third, the district court's reliance on the decision in *Roberts*, 128 F.3d 647 is misplaced. That decision is incompatible with Wyoming precedent. In *Roberts*, 128 F.3d at 648-49, the patient "had surgery for severe urological problems" in May, 1990. "For reasons not explained in the record," Dr. Francis also removed Ms. Roberts' only remaining ovary. Ms. Roberts "remained under the care of Dr. Francis until February 1996." However, Dr. Francis did not inform Ms. Roberts that her ovary had been removed. She did not learn of the removal until September, 1994, when she was treated by a different doctor. Ms. Roberts filed a medical malpractice claim against Dr. Francis and the medical center in June, 1996. She "advanced two theories under which the [two-year] statute [of limitations] should be tolled: continuous treatment and fraudulent concealment." The district court granted summary judgment to Dr. Francis and the medical center "as to both theories." The appeals court "reverse[d] and remand[ed] for trial on the fraudulent concealment claim," but affirmed the district court's ruling that the

continuous treatment rule did not toll the statute of limitations for Ms. Roberts' claim.

[¶29]  The appeals court recognized that continuous treatment operated to toll the Arkansas statute of limitations, but also stated that, "[w]here, however, a patient is able to identify the specific negligent treatment that caused his/her injury, the continuous treatment does not toll the statute of limitations." *Id.* at 651.  The appeals court quoted and agreed with the district court's ruling:

> It is well settled that where a single, isolated act constitutes the alleged act of medical malpractice, the "continuous treatment" doctrine does not apply.  A careful reading of Arkansas law indicates that the recognized exception is limited to those situations wherein a plaintiff cannot identify one treatment that produced his injury but where his injury was the result of several treatments – a "cumulative effect." The evidence here shows that plaintiff was aware of the negligent act – the surgery – which caused her injury. . . . The "continuous treatment" doctrine is inapplicable and does not extend the limitations period.

*Id*. at 651-52.

[¶30]  That result is directly contrary to our decision in *Jauregui*.  In that case, Dr. Oliver performed rotator cuff surgery on Mr. Jauregui on January 11, 1999, and apparently due to infection, Mr. Jauregui had a second shoulder operation on February 26, 1999. *Jauregui*, ¶ 3, 111 P.3d at 915.  "During this [second] operation, a surgical sponge was found that had been left inside Mr. Jauregui's shoulder during the first operation." *Id.* He filed a complaint against Dr. Oliver and the hospital on February 26, 2001.

[¶31]  If we had applied the reasoning of the *Roberts* case, we would have said that Mr. Jauregui was not injured as the cumulative result of several treatments, but that he could identify the single negligent act – the initial surgery – that caused his injury.  We would have held that the continuous treatment rule was inapplicable, and that Mr. Jauregui was required to file suit within two years of January 11, 1999, the date of the first surgery that caused the injury.

[¶32]  We did not apply the reasoning of the *Roberts* case.  Instead, we ruled that:

> The continuous treatment doctrine directly applies to the instant case.  Dr. Oliver's treatment to repair Mr. Jauregui's torn rotator cuff tendon did not end with the first surgery. Dr. Oliver continued to treat Mr. Jauregui specifically with regard to his rotator cuff tendon surgery.  Dr. Oliver treated

the immediately ensuing infection, and Dr. Oliver performed the second surgery wherein the surgical sponge was removed. Each treatment up to the second surgery on February 26 was directly connected to the initial surgery. Thus, the act constituting the final act in the course of treatment for the surgical repair of Mr. Jauregui's torn rotator cuff was the second surgery. The statute of limitation thus began to run as of the date of the second surgery. The underlying malpractice action, brought within two years of that date, is not time barred.

*Jauregui*, ¶ 10, 111 P.3d at 917.

[¶33] As we observed in *Jauregui*, ¶ 9, 111 P.3d at 917:

> Almost twenty years ago, this Court, in *Metzger v. Kalke*, 709 P.2d 414 (Wyo. 1985), in construing § 1-3-107, defined the "act, error or omission which starts the running of the statute of limitations against malpractice actions" as "the termination of the course of treatment for the same or related illnesses or injuries." *Id.* at 417. This is commonly referred to as the "continuous treatment" doctrine. The legislature has not changed the statute since *Metzger* was decided. The continuous treatment doctrine remains applicable in Wyoming.

The continuous treatment rule also applies in this case. The evidence indicates that Mr. Nobles continued to be treated for "the same or related" condition until his discharge from the hospital on March 15, 2008. His claim filed on March 11, 2010, was within the two-year period of the applicable statute of limitations.

### III. The Single Act Exception to the Continuous Treatment Rule

[¶34] The Hospital contends that, if the continuous treatment rule applies, Mr. Nobles' case qualifies for the single act exception to that rule. Mr. Nobles asserts that the single act exception has not been adopted in Wyoming. He further contends that the exception does not apply to his case.

[¶35] We discussed the single act exception in *Jauregui*. After explaining the continuous treatment rule, we noted an exception to that rule, stating as follows:

14

Dr. Oliver argues that the "single-act" exception to the continuous treatment doctrine applies to the facts of this case. Dr. Oliver argues that the continuous treatment doctrine applies only when there is no single identifiable act of malpractice from which the statute of limitation can be said to run. Dr. Oliver contends that, in the instant case, any alleged malpractice was a single act that, if it occurred at all, occurred during the January 11, 1999, surgery. Thus, according to Dr. Oliver, the continuous treatment doctrine does not apply and the statute of limitation began to run on January 11, 1999.

While it is true that the continuous treatment doctrine applies to cases involving a continuous course of treatment where no single act can be pointed to as the act of malpractice, *see Sharsmith v. Hill*, 764 P.2d 667 (Wyo. 1988) (negligent misdiagnosis); *Metzger v. Kalke*, 709 P.2d 414 (Wyo. 1985) (negligent misdiagnosis), the doctrine is not so strictly limited. Minnesota courts have offered a very complete definition of the "single-act" exception:

> At the time Doyle filed her May 6, 1999, claim, the medical malpractice statute of limitations required that claims be commenced within two years of the accrual of the cause of action. *See* Minn. Stat. § 541.07(1) (1998). Generally, the "cause of action accrues when the physician's treatment for a particular condition ceases." *Grondahl v. Bulluck*, 318 N.W.2d 240, 243 (Minn. 1982) (citation omitted). This is the general termination of treatment rule.

> But where there is a single act of allegedly negligent conduct, the statute of limitations begins to run at the time the plaintiff sustains damage from the act. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 428-29 (Minn. 1988). More precisely, the cause of action begins to run at the time of the negligent act (and not at the end of the course of treatment) when the alleged tort consists of (1) a single act; (2) which is complete at a precise time; (3) which no continued course of treatment can either cure or relieve; and (4) where the plaintiff is actually aware of the facts upon which the claim is based; that is, the plaintiff is aware of the malpractice prior to the end of

15

> treatment. *Swang v. Hauser*, 288 Minn. 306, 309, 180 N.W.2d 187, 189-90 (1970). We refer to this rule as the "single-act" exception.
>
> *Doyle v. Kuch*, 611 N.W.2d 28, 31 (Minn. App. 2000).

*Jauregui*, ¶¶ 11-12, 111 P.3d at 917-18. We went on to explain that factors three and four were not supported by the underlying facts, and concluded that the single act exception did not apply. *Id.*, ¶ 13, 111 P.3d at 918. We did not specifically adopt the exception in that case.

[¶36] We also referenced the single act exception in our decision in *Ballinger v. Thompson*, 2005 WY 101, ¶ 29, 118 P.3d 429, 438 (Wyo. 2005). *Ballinger* involved a legal malpractice claim. We concluded that the continuous representation doctrine should not be adopted "in these circumstances." *Id.*, ¶ 27, 118 P.3d at 437. We did not specifically adopt the single act exception in that case.

[¶37] For several reasons, we conclude that the single act exception should not be adopted in Wyoming. From our review, it appears that the rule has not been widely applied in other jurisdictions. More significantly, application of the exception as set forth in *Doyle*, leads to results that are at odds with our precedent. From a practical perspective, the rule is difficult to apply and leads to confusion rather than predictability.

[¶38] We have found little application of the single act exception outside of Minnesota. There is no question that it is widely applied in that state. In *Jauregui*, we introduced the single act exception and the four factors that must be satisfied for the exception to apply by quoting *Doyle v. Kuch*, a decision of the Minnesota Court of Appeals. In *Doyle*, the court provided insight regarding application of the single act exception in Minnesota. The court states:

> In so holding, we are mindful that the Minnesota Supreme Court has expressly rejected the notion that a physician's continuing "non-treatment" is sufficient to toll the statute of limitations. *See Fabio v. Bellomo*, 504 N.W.2d 758, 762 (Minn. 1993) (holding that the single act exception applied where the physician misdiagnosed the plaintiff's illness and overlooked her breast cancer during later visits). We also recognize that, ordinarily, subsequent remedial treatment does not toll the statute. *See, e.g., Haberle v. Buchwald*, 480 N.W.2d 351, 356 (Minn. App. 1992), *review denied* (Minn. Aug. 4, 1992); *Crenshaw v. St. Paul Ramsey Med. Ctr.*, 379 N.W.2d 720, 721 (Minn. App. 1986), *review denied* (Minn. Mar. 27, 1986).

16

611 N.W.2d at 32. The decision of the Minnesota Supreme Court in *Fabio* is irreconcilable with the decision we reached in *Sharsmith*, 764 P.2d 667.

[¶39] *Fabio* involved a medical malpractice suit brought by Ms. Fabio against Dr. Bellomo who was Ms. Fabio's primary care physician from 1977 to 1986. *Id.*, 504 N.W.2d at 760. Ms. Fabio claimed, among other things, that Dr. Bellomo had misdiagnosed her breast cancer as a "fibrous mass" at some time between 1982 and 1984. *Id*. Ms. Fabio brought her claim after she received a diagnosis of cancer from another doctor in 1987. Applying a two-year statute of limitations, the Minnesota Supreme Court ruled that her suit was not timely with regard to the misdiagnosis that occurred between 1982 and 1984.

> When Dr. Bellomo examined Fabio's breast between 1982 and 1984, he did not recommend any further treatment. His treatment of her condition ceased at the time he told her not to worry about it. We therefore hold that the trial court was correct to rule that Dr. Bellomo's examinations of Fabio's breast that occurred between 1982 and 1984 are barred by the statute of limitations, because these examinations were not part of a continuing course of treatment.

*Id*. at 762.

[¶40] In *Sharsmith*, we also were faced with application of a statute of limitations in a medical malpractice misdiagnosis case. We reached a different result. In that case, Ms. Sharsmith had a tumor surgically removed from behind her knee on May 19, 1982, by Dr. Feagin. *Id.*, 764 P.2d at 668. Dr. Fogarty, a pathologist, examined samples of the tumor and diagnosed it as benign. On December 6, 1982, Ms. Sharsmith returned to Dr. Feagin because of swelling at the site of the operation. He asked her to return in a month, and she saw him again on January 18, 1983. This time, Dr. Feagin asked Dr. Fogarty to re-examine the preserved samples. Dr. Fogarty again said the tumor was benign. When Ms. Sharsmith returned to Dr. Feagin on February 15, 1983, he found "two distinct masses at or near the operative site." *Id*. at 669. He referred her to Dr. Coleman for a "second biopsy and pathological diagnosis." *Id*. Dr. Coleman determined that the two new masses, as well as the tumor removed in 1982, were malignant. *Id*. Ms. Sharsmith elected to have her left leg amputated above the knee. The amputation was performed on March 16, 1983. *Id.*

[¶41] Ms. Sharsmith sued Dr. Fogarty in February, 1985. The district court granted summary judgment in favor of Dr. Fogarty. *Id*. We applied the continuous treatment doctrine and reversed the district court's decision. We determined that "with respect to the treating physician, Dr. Feagin, a continuous course of treatment existed at least until

he referred [Ms. Sharsmith] to Dr. Coleman on February 15, 1983." *Id*. Dr. Feagin was not a party to the lawsuit, but we concluded that his course of treatment should be imputed to Dr. Fogarty because

> it was Dr. Feagin's adherence to Dr. Fogarty's diagnosis which dictated the nature and duration of appellant's treatment. . . . Until the alleged misdiagnosis was corrected, or until Dr. Feagin ceased to rely upon it, Dr. Fogarty's constructive involvement in that treatment was sufficient to constitute the requisite assistance or association and prevent the running of the statute of limitations.

*Id*. at 670. Our analysis and decision in *Sharsmith* cannot be reconciled with the decision reached by the Minnesota Supreme Court in *Fabio*.

[¶42] In *Doyle*, the court recognized that in Minnesota, "ordinarily, subsequent remedial treatment does not toll the statute." *Id.*, 611 N.W.2d at 32. That approach is also inconsistent with application of the continuous treatment doctrine in Wyoming. For example, in *Jauregui*, Dr. Oliver provided remedial treatment to the patient by treating the infection following the first surgery and performing a second surgery. *Jauregui*, ¶ 3, 111 P.3d at 915. We held that the statute of limitations did not begin to run until the remedial treatment had concluded. *Id.*, ¶ 17, 111 P.3d at 919. The remedial treatment was apparently successful in *Jauregui*, but we are hard pressed to understand why the success or failure of remedial efforts by the treating physician should impact the start of the running of the statute of limitations. Evaluation of the success of remedial treatment also makes the exception difficult to apply.

[¶43] As noted above, the Minnesota Court of Appeals listed four factors that must be satisfied for the exception to apply. *Doyle*, 611 N.W.2d at 31. The third factor is the most problematic. In order for the exception to apply, it must be established that "no continued course of treatment can either cure or relieve" the damage. But unless a patient dies immediately as a result of the malpractice, some form of follow-up treatment will likely be given in every case.

[¶44] In this case, the success of the treatment provided by the Hospital to Mr. Nobles for injuries caused by the pulling on his arm may be in dispute. Under the third factor of the Minnesota exception, if the treatment was successful and Mr. Nobles was "cured," the single act exception would not apply. If the Hospital's subsequent treatment failed to provide any "relief," the third factor would apparently be satisfied, and the single act exception would apply. In applying the exception, it is unclear what decision should be reached if the remedial treatment provided some relief but did not result in a "cure." Such a situation is simply unworkable and is at odds with the basic policies at the heart of the continuous treatment rule. Because the single act exception is inconsistent with our

precedent, not widely accepted, and difficult to apply, we decline to adopt the single act exception to the continuous treatment rule in Wyoming.

## *IV. Summary Judgment*

[¶45]   The applicable statute of limitations required Mr. Nobles to present his claim within two years.  Mr. Nobles has presented evidence indicating that the Hospital treated him for the pain and dysfunction in his shoulder and arm until he was discharged.  We must consider this evidence in the light most favorable to Mr. Nobles.  Applying the continuous treatment rule to this evidence, the statute of limitations began running on the date of his discharge from the hospital, March 15, 2008.  He presented his claim to the Hospital, along with his claim to the Wyoming Medical Review Panel, on March 11, 2010, just under two years from the date of his discharge.  The district court erred in granting summary judgment in favor of the Hospital and against Mr. Nobles.  We decline to adopt the single act exception to the continuous treatment rule.  This case is reversed and remanded for further proceedings consistent with this opinion.